# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

Argued January 23, 2013       Decided February 26, 2013

No. 11-1146

AMERICAN ELECTRIC POWER SERVICE CORPORATION, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

CONSUMERS ENERGY COMPANY, ET AL.,
INTERVENORS

_____

On Petition for Review of an Order
of the Federal Communications Commission

_____

*Eric B. Langley* argued the cause for petitioners. With him on the briefs were *J. Russ Campbell*, *Jason B. Tompkins*, and *Sean B. Cunningham*.

*John B. Richards* and *Thomas B. Magee* were on the brief for intervenors Consumers Energy Company, et al. in support of petitioners.

*Edward H. Comer*, *Aryeh B. Fishman*, *Shirley S. Fujimoto*, *Jeffrey L. Sheldon*, and *Kevin M. Cookler* were on the brief for *amicus curiae* Edison Electric Institute in support of petitioners.

*C. Grey Pash Jr.*, Counsel, Federal Communications Commission, argued the cause for respondents. On the brief were *Robert B. Nicholson* and *Kristen C. Limarzi*, Attorneys, U.S. Department of Justice, and *Austin C. Schlick*, General Counsel, Federal Communications Commission, *Peter Karanjia*, Deputy General Counsel, and *Richard K. Welch*, Deputy Associate General Counsel. *Laurel R. Bergold*, Attorney, Federal Communications Commission, entered an appearance.

*Helgi C. Walker* argued the cause for intervenors United States Telecom Association, et al. With her on the brief were *Bennett L. Ross*, *Brendan T. Carr*, *John E. Benedict*, *William A. Brown*, *Gary L. Phillips*, *Michael E. Glover*, *Edward Shakin*, and *Katharine R. Saunders*.

*Jonathan E. Nuechterlein* argued the cause for intervenors Comcast Corporation, et al. With him on the brief were *Kelly P. Dunbar*, *Rick Chessen*, *Neal M. Goldberg*, *Lynn R. Charytan*, *T. Scott Thompson*, *Michael T.N. Fitch*, *Craig Gilmore*, *Alan G. Fishel*, *Jeffrey E. Rummel*, *Adam D. Bowser*, *David P. Murray*, *Thomas Jones*, *Gardner Gillespie*, *Wesley R. Heppler*, *Paul Glist*, *Daniel L. Brenner*, *Michael F. Altschul*, *Brian M. Josef*, *Jonathan D. Hacker*, *Loren L. AliKhan*, and *John D. Seiver*. *Christopher A. Fedeli*, *Paul A. Werner III*, *Christopher M. Heimann*, and *Heather M. Zachary* entered appearances.

Before: TATEL, *Circuit Judge*, and WILLIAMS and SENTELLE, *Senior Circuit Judges*.

3

———

WILLIAMS, *Senior Circuit Judge*:  Section 224 of the Communications Act of 1934, 47 U.S.C. § 224, provides a variety of advantages to certain types of firms seeking to attach their wires, cable, or other network equipment to utility poles.  The Federal Communications Commission, which is charged with applying § 224, in 2011 made three revisions to its interpretation of the statute.  *In the Matter of Implementation of Section 224 of the Act,* Report and Order and Order on Reconsideration, 26 FCC Rcd. 5240 (April 7, 2011) ("Order").  The Order (1) for the first time allows incumbent local exchange carriers ("ILECs") (which are principally the descendants of the "Baby Bells" that emerged from AT&T's 1984 break-up, see 47 U.S.C. § 251(h)) to share the benefits of some of § 224's provisions; (2) reformulates the ceiling on the rate that pole-owning utilities can charge "telecommunications carriers" seeking to make pole attachments; and (3) moves back the date as of which compensatory damages start to accrue in favor of parties filing successful complaints against utilities.  The reader should note that because § 224(a)(5) excludes ILECs from the definition of "telecommunications carriers," the newly reformulated rates do not directly affect the rates chargeable to ILECs.

Petitioners, the American Electricity Power Services Corporation and other power companies, challenge all three changes.  We reject petitioners' arguments and deny the petition.

\* \* \*

Before the advent of cable television, utilities—including power companies and ILECs—owned and operated extensive networks of poles that carried their wires, cables, and other network equipment.  These utilities often shared poles,

operating them under joint ownership agreements that split the costs. Cable companies sought access to the poles for their own network equipment; the utilities, in turn, sought "to charge monopoly rents" for that access. *Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 330 (2002) ("*NCTA*").

In 1978 Congress responded by passing the Pole Attachment Act ("the 1978 Act"), adding it as § 224 of the Communications Act. (Because we address many provisions of § 224, we attach its current version below in its entirety.) The 1978 Act provided that "the Commission shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable." 47 U.S.C. § 224(b)(1). It also adopted upper and lower bounds for "just and reasonable" rates: the upper bound is "the fully allocated cost of the construction and operation of the pole to which [the] cable is attached," *FCC v. Florida Power Corp.*, 480 U.S. 245, 253 (1987), the lower bound the "marginal cost of [the] attachments," *id*. See 47 U.S.C. § 224(d)(1). Under this authority, the Commission adopted a rate formula that has become known as the "cable rate." See 47 C.F.R. § 1.1409(e)(1).

The Telecommunications Act of 1996 ("the 1996 Act") adjusted and expanded the provisions of the 1978 Act. Three sets of changes in the 1996 Act are especially relevant to this petition. First, the 1996 Act amended § 224 to define a "pole attachment" as "any attachment by a cable television system *or provider of telecommunications service* to a pole, duct, conduit, or right-of-way owned or controlled by a utility." 47 U.S.C. § 224(a)(4)(emphasis added). The 1978 Act had identified only cable television systems as § 224's potential beneficiaries.

Second, besides clarifying the definition of "utility" to include local exchange carriers (i.e., ILECs and competitive

LECs), the 1996 Act provided a special definition of "telecommunications carrier," excluding ILECs from that category for purposes of § 224. 47 U.S.C. § 224(a)(5). Its language is the gravamen of petitioners' claim that ILECs are not in any respect among § 224's beneficiaries.

Third, Congress added § 224(e) to authorize the FCC to develop regulations governing the charges for "pole attachments used by telecommunications carriers to provide telecommunications services." In 1998 the Commission issued such regulations, thereby establishing what has been known as the "telecom rate." See *Implementation of Section 703(e) of the Telecommunications Act of 1996*, 13 FCC Rcd 6777, 6822-23, ¶¶ 99-102 (1998) ("1998 Order"). The 1996 Act left intact the Commission's broad rate-setting authority under § 224(b)(1).

In 2011 the Commission issued the Order, adopting the three new interpretations identified at the outset. We review the Commission's interpretation of § 224 for reasonableness under the familiar standard of *Chevron, USA, Inc. v. NRDC, Inc.,* 467 U.S. 837 (1984), "which . . . means (within its domain) that a 'reasonable agency interpretation prevails.'" *Northern Natural Gas Co. v. FERC*, 700 F.3d 11, 14 (D.C. Cir. 2012) (quoting *Entergy Corp. v. Riverkeeper, Inc.,* 556 U.S. 208, 218 (2009)). Because the Order is a change in the Commission's position, the requirement of reasoned decisionmaking demands that it "display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.*

6

* * *

*ILECs' Pole Attachment Rights.* Section 224(a)(4), as amended by the 1996 Act, defines a pole attachment as any attachment either by the operators of cable television systems covered by the 1978 Act or by any "provider of telecommunications services." The Commission relies on § 224(a)(4) to support its decision to allow ILECs access to benefits from § 224. Petitioners challenge that conclusion, claiming that via § 224(a)(5) Congress intended to rigorously exclude ILECs from any of those benefits.

We reiterate, to make clear just what the Commission has and has not done, that it has not purported to bring ILECs under the new telecom rate adopted under § 224(e)(1). The Order simply classifies ILECs as among the potential beneficiaries of § 224(b)(1), which authorizes the Commission to regulate the rates, terms and conditions of "pole attachments" and assure that they are "just and reasonable." For now, noting the existence of possible distinctions between ILECs and other pole attachers, the Commission says that it will handle any complaints by ILECs "on a case-by-case basis." Order ¶ 214 & n.647.

To support their challenge, petitioners point to the two statutory provisions that define "telecommunications carrier." First, § 153(51), part of the Act's general list of definitions for Chapter 5, provides (with an irrelevant exception) that "[t]he term 'telecommunications carrier' means any provider of telecommunications services." Second, § 224(a)(5) specifies that "[f]or purposes of this section, the term 'telecommunications carrier' (as defined in section 153 of this title) does not include any incumbent local exchange carrier as defined in section 251(h) of this title," i.e., does not include any ILEC. Thus, because § 224(a)(5) excludes ILECs from the category "telecommunications carrier," and § 153 partially defines "telecommunications carrier" as "any *provider of*

*telecommunications services*," petitioners argue that for purposes of § 224 there is a simple equation: telecommunications carriers equals providers of telecommunications services (and thus, by definition, the reverse). Accordingly, in their view, § 224(a)(5)'s exclusion of ILECs necessarily applies to § 224(a)(4)'s reference to "a provider of telecommunications services."

We will accept, for purposes of this analysis, petitioners' assumption that the word "means" is equivalent to "equals," see *Helvering v. Morgan's, Inc.*, 293 U.S. 121, 125 n.1 (1934), though we think that such equivalence is in fact not universal. With that assumption, it is true that under § 153(51), telecommunications carrier equals provider of telecommunications services, and thus vice versa, or, to express that equation in the sort of mathematical language that petitioners have invoked,

$$TC = PTS.$$

We agree with this reading of § 153(51).

Section 224(a)(5) provides another, related equation. Paraphrasing § 224(a)(5) by substituting § 153(51)'s definition of telecommunication carrier for the cross reference, we have the proposition: telecommunications carrier (for purposes of § 224) equals provider of telecommunications services *minus* ILECs. (This formulation assumes the undisputed proposition that without the qualifying language of § 224(a)(5) ILECs are "providers of telecommunication services.") So, if we use $TC_{224}$ to signify "telecommunications carriers for purposes of § 224," § 224(a)(5) means

$$TC_{224} = PTS - ILEC,$$

and, equivalently,

$$PTS = TC_{224} + ILEC.$$

Thus, on petitioners' own rather mathematized reading of the statute, § 224(a)(4)'s reference to any "provider of telecommunications services" embraces ILECs rather than excludes them.

Before turning to explain why this reading makes contextual sense, we pause to identify petitioners' error. They take the first definition, § 153(51), and insert into it § 224(a)(5)'s exclusion of ILECs, but fail to note that § 153(51) is the *general* definition of telecommunications carrier, not the one tailored to § 224. Thus, they take § 153(51)'s equation TC = PTS and claim to find TC$_{224}$ = PTS. But Congress never said the latter.

Congress's uses of the two terms (telecommunications carrier, provider of telecommunications services) conform readily to the understanding we have just sketched out. Section 224(a)(4), defining pole attachment to include an attachment by a "provider of telecommunications services," is cheek by jowl with § 224(a)(5), with its restricted definition of telecommunication carrier. This proximity suggests an entirely intentional character in § 224(a)(4)'s use of the broader term. Petitioners detect an anomaly in the Commission's reading of § 224(a)(5), as § 224(f) mandates that utilities provide nondiscriminatory access *only* for "a cable television system or any telecommunications carrier," 47 U.S.C. § 224(f)(1), despite the Commission's view that ILECs benefit from the statute as providers of telecommunications services. But as the Commission pointed out, the result simply puts ILECs in the position that cable television stations occupied between 1978 and 1996: open to the benefits of § 224(b) but with no explicit right to nondiscriminatory access. Order ¶ 212.

Because the Commission in 2011 was changing from one supposedly permissible interpretation of § 224(a)(5) to another permissible interpretation, it set out to justify the

change. Given our analysis of the relevant language, we very much doubt if the prior interpretation was reasonable. Assuming that it was, we assess the Commission's explanation for its change of view under the latitudinarian standards of *Fox*. That explanation was in essence that whereas in 1978 the power companies and the historic phone companies had, by virtue of the roughly equal scale of their pole systems, roughly equal incentives for sharing, that equality had since eroded, leaving the power companies with a far higher proportion of poles and a lesser incentive to share. See Order ¶ 206. While petitioners say that the Commission's data for the past are wrong, their only attack on its numbers for the present is that the data are incomplete and might not be representative. See Pet'rs Br. at 28. They have offered neither conflicting data on the current situation, nor any actual reason to suppose that the Commission's numbers are materially unrepresentative. There is therefore every reason to believe the new view satisfies *Fox*'s requirements that "there are good reasons for" the Commission's choice (assuming it was free to choose), and "that the [Commission] *believes* [the new interpretation] to be better." *Fox*, 556 U.S. at 515.

Accordingly we uphold the Commission's view that ILECs are "providers of telecommunications services" for purposes of § 224(a)(4).

*Telecom Rate Revision.* Petitioners separately challenge the Commission's decision to adopt telecom rates under §§ 224(d) & (e) that it has designed to be substantially equivalent to its already adopted cable rates. (The new telecom rates, unless the Commission should apply them independently to ILECs via its rate-setting authority under §§ 224(a)(4) and (b), apply only to telecommunications carriers as defined above. See *NCTA*, 534 U.S. at 335-36 (rejecting the contention that §§ 224(d) & (e) limit the Commission's authority under § 224(b)(1) to define just and

reasonable rates outside the "self-described scope" of the former); Order ¶¶ 214-20.)

While § 224(b)(1) gives the Commission broad authority to ensure that pole attachment rates are "just and reasonable," other provisions of § 224 limit that authority. Section 224(d), applying to "the rate for any pole attachment used by a cable television system solely to provide cable service," 47 U.S.C. § 224(d)(3), sets a lower bound (roughly, incremental cost) and an upper bound (roughly, fully allocated cost) to govern the Commission's formulation of the cable rate, *id*. § 224(d)(1).

Section 224(e), the statutory basis for the telecom rate, is in important respects less specific than § 224(d). Paragraph (1) authorizes the Commission to "prescribe regulations . . . to govern the charges for pole attachments used by telecommunications carriers to provide telecommunications services, when the parties fail to resolve a dispute over such charges," *id*. § 224(e)(1), and then gives the utilities instructions for apportioning, among the entities using a pole, both "the cost of providing space on a pole . . . other than usable space among entities," and the cost of providing "usable space," *id*. §§ 224(e)(2) & (3). The parties agree that, while § 224(e) prescribes the apportionment criteria rather specifically, it nowhere defines the term "cost."

As the Commission explained in the Order, the previous cable and telecom rate formulae yielded markedly different results. The Commission estimates that the formulae promulgated under the 1998 Order yielded rates for cable of about 7.4% of the annual pole cost, and rates for telecom ranging between 11.2% and 16.9% of the annual pole cost. Order ¶ 131 n.399. The Order reinterpreted §§ 224(e)(2) and (3) with the goal of reducing this disparity, so that the telecom rate would generally "recover the same portion of pole costs as the current cable rate." *Id*. ¶ 8. The Commission justified

its decision by stating that the revised telecom rate would "significantly reduce the marketplace distortions and barriers to the availability of new broadband facilities and services that arose from disparate rates." *Id.* ¶ 151. To reach this convergence, it gave utilities the option of charging the higher of either the original telecom rate with a cost factor multiplied by fractional coefficients—66% for urban poles, and 44% for rural poles (priced differently due to the difference in quantity of attachments likely to occur in urban versus rural areas, see *id.* ¶ 150)—or a rate aimed at covering all costs *caused* by an attachment, *id.* ¶¶ 143-44. Petitioners, though objecting to the rates, do not contest the Commission's view that this latter option satisfies the lower bound set out in § 224(d)(1). (The Eleventh Circuit has held that the constitutional bar on takings without just compensation generally allows application of the lower bound, subject to narrow exceptions. *Alabama Power Co. v. FCC*, 311 F.3d 1357, 1367-71 (11th Cir. 2002).)

The Commission expressly justifies its current policy in terms of eliminating the differences between the cable and telecom rates (subject, of course, to complying with § 224(d)(1)'s lower bound). But petitioners claim that the word "cost" as used in § 224(e) blocks the Commission's move by clearly requiring use of fully allocated costs. They invoke in support the statute's references to the cost of the space on the pole (either usable or not usable), and say that "cost" must necessarily refer to the pole's fully allocated cost. But as the Commission found, the term "cost" in §§ 224(e)(2) and (3) is necessarily ambiguous, and could thus "yield a range of rates from the existing fully allocated cost approach at the high end to a rate closer to incremental cost at the low end." Order ¶ 8. Indeed, the Supreme Court, in the course of endorsing one of the most innovative calculations of cost in the history of regulation, said:

> The fact is that without any better indication of meaning than the unadorned term, the word "cost" in

> [47 U.S.C.] § 252(d)(1), as in accounting generally, is "a chameleon," *Strickland v. Commissioner, Maine Dept. of Human Services,* 96 F.3d 542, 546 (C.A.1 1996), a "virtually meaningless" term, R. Estes, Dictionary of Accounting 32 (2d ed.1985).

*Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 500 (2002). And we have previously held that the term "cost," without more, is open to a wide range of reasonable interpretations. Thus we have found the statutory term "legitimate, verifiable and economic costs" ambiguous as to the inclusion of "stranded" costs, *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 703-04 (D.C. Cir. 2000) (per curiam), *aff'd*, 535 U.S. 1 (2002), and held that, within the framework of rates based on "cost," statutory mandates against rate discrimination did not generally bar an agency from allowing allocation of rates among classes of customers on the basis of their elasticity of demand, *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1009-12 (D.C. Cir. 1987).

The Commission's chosen methodology—which petitioners characterize as "nothing more than an algebraic sleight of hand designed to conflate" the two rates, see Pet'rs Br. at 16—draws on determinations that the revised rate will (1) "eliminate distortions in end-user choices between technologies, and lead to [telecom] provider behavior being driven more by underlying economic costs than arbitrary price differentials," Order ¶ 147, and (2) reflect a national "interest in continued pole investment," *id*. ¶ 8. Although petitioners challenge this policy justification, they offer neither theory nor fact to contradict the Commission's fundamental proposition that artificial, non-cost-based differences in the prices of inputs among competitors are bound to distort competition, handicapping the disfavored competitors and at the margin causing market share and capital to flow to less efficient firms. In the absence of some feature of the law or facts that contradicts the Commission's effort to eliminate that

distortion, its reasoning amply satisfies the standard imposed by *Fox*.

Because the Commission's methodology is consistent with the unspecified cost terms contained in § 224(e), and the Commission's justifications are reasonable, the revision warrants judicial deference.

*Refund Period.* The Order revised the Commission's earlier determination that overcharged attachers are entitled to refunds starting at the date of the initial complaint. In its place, the Commission will now determine the refund period "consistent with the applicable statute of limitations." 47 C.F.R. § 1.1410(a)(3). The Commission argues that petitioners have waived their challenge by failing to raise the issue before the agency, but under *United Church of Christ v. FCC*, 779 F.2d 702, 706 (D.C. Cir. 1985), 47 U.S.C. § 405(a)(2)'s requirements are satisfied so long as the issues were presented to the Commission by some party, even if not by the party raising the issue on appeal. See Order ¶ 106 & n.329.

Petitioners' arguments have no serious statutory basis. Section 224(b)(1) provides, in relevant part, that "the Commission shall regulate the rates, terms, and conditions for pole attachments"; it "shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions"; and "[f]or purposes of enforcing any determinations resulting from complaint procedures established pursuant to this subsection, the Commission shall take such action as it deems appropriate and necessary." 47 U.S.C. § 224(b)(1).

Under this broad authorization, it is hard to see any legal objection to the Commission's selection of any reasonable period for accrual of compensation for overcharges or other violations of the statute or rules. The current Order has amended 47 C.F.R. § 1.1410 to provide that refunds or

payments are to be made "consistent with the applicable statute of limitations," but it does not appear to specify what makes a limitations period applicable. Petitioners note but do not complain about that uncertainty. Pet'rs Br. at 53.

As with the other issues on appeal, the Order reverses decades-old Commission policy. The original theory for adopting the date-of-complaint rule was that such a limitation would tend to "avoid abuse and encourage early filing when rates are considered objectionable." *In the Matter of Adoption of Rules for the Regulation of Cable Television Pole Attachments*, First Report and Order, 68 FCC 2d 1585, ¶ 45 (Aug. 11, 1978). In explaining its change of viewpoint, the Commission has noted that such a system gave parties a "disincentive to engage in pre-complaint negotiation," as doing so would cut the complainant's recovery period short. Order ¶ 111 n.345. Petitioners identify neither a material flaw in that reasoning nor any powerful countervailing consideration. As the Commission has met *Fox*'s modest demands for changing its policy, upholding its decision follows ineluctably.

\* \* \*

We have considered petitioners' many subsidiary arguments and find them to be without merit. The petition is

*Denied*.

Statutory Appendix: 47 U.S.C. § 224 (2010)

(a) Definitions

As used in this section:

(1) The term "utility" means any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications. Such term does not include any railroad, any person who is cooperatively organized, or any person owned by the Federal Government or any State.

(2) The term "Federal Government" means the Government of the United States or any agency or instrumentality thereof.

(3) The term "State" means any State, territory, or possession of the United States, the District of Columbia, or any political subdivision, agency, or instrumentality thereof.

(4) The term "pole attachment" means any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.

(5) For purposes of this section, the term "telecommunications carrier" (as defined in section 153 of this title) does not include any incumbent local exchange carrier as defined in section 251(h) of this title.

(b) Authority of Commission to regulate rates, terms, and conditions; enforcement powers; promulgation of regulations

(1) Subject to the provisions of subsection (c) of this section, the Commission shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable, and shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions. For purposes of enforcing any determinations resulting from complaint

procedures established pursuant to this subsection, the Commission shall take such action as it deems appropriate and necessary, including issuing cease and desist orders, as authorized by section 312(b) of this title.

(2) The Commission shall prescribe by rule regulations to carry out the provisions of this section.

(c) State regulatory authority over rates, terms, and conditions; preemption; certification; circumstances constituting State regulation

(1) Nothing in this section shall be construed to apply to, or to give the Commission jurisdiction with respect to rates, terms, and conditions, or access to poles, ducts, conduits, and rights-of-way as provided in subsection (f) of this section, for pole attachments in any case where such matters are regulated by a State.

(2) Each State which regulates the rates, terms, and conditions for pole attachments shall certify to the Commission that--

(A) it regulates such rates, terms, and conditions; and

(B) in so regulating such rates, terms, and conditions, the State has the authority to consider and does consider the interests of the subscribers of the services offered via such attachments, as well as the interests of the consumers of the utility services.

(3) For purposes of this subsection, a State shall not be considered to regulate the rates, terms, and conditions for pole attachments--

(A) unless the State has issued and made effective rules and regulations implementing the State's regulatory authority over pole attachments; and

(B) with respect to any individual matter, unless the State takes final action on a complaint regarding such matter--

(i) within 180 days after the complaint is filed with the State, or

(ii) within the applicable period prescribed for such final action in such rules and regulations of the State, if the prescribed period does not extend beyond 360 days after the filing of such complaint.

(d) Determination of just and reasonable rates; "usable space" defined

(1) For purposes of subsection (b) of this section, a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

(2) As used in this subsection, the term "usable space" means the space above the minimum grade level which can be used for the attachment of wires, cables, and associated equipment.

(3) This subsection shall apply to the rate for any pole attachment used by a cable television system solely to provide cable service. Until the effective date of the regulations required under subsection (e) of this section, this subsection shall also apply to the rate for any pole attachment used by a cable system or any telecommunications carrier (to the extent such carrier is not a party to a pole attachment agreement) to provide any telecommunications service.

(e) Regulations governing charges; apportionment of costs of providing space

(1) The Commission shall, no later than 2 years after February 8, 1996, prescribe regulations in accordance with this subsection to govern the charges for pole attachments used by

telecommunications carriers to provide telecommunications services, when the parties fail to resolve a dispute over such charges. Such regulations shall ensure that a utility charges just, reasonable, and nondiscriminatory rates for pole attachments.

(2) A utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.

(3) A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space required for each entity.

(4) The regulations required under paragraph (1) shall become effective 5 years after February 8, 1996. Any increase in the rates for pole attachments that result from the adoption of the regulations required by this subsection shall be phased in equal annual increments over a period of 5 years beginning on the effective date of such regulations.

(f) Nondiscriminatory access

(1) A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it.

(2) Notwithstanding paragraph (1), a utility providing electric service may deny a cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way, on a non-discriminatory basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes.

(g) Imputation to costs of pole attachment rate

A utility that engages in the provision of telecommunications services or cable services shall impute to its costs of providing such services (and charge any affiliate, subsidiary, or associate company engaged in the provision of such services) an equal amount to the pole attachment rate for which such company would be liable under this section.

(h) Modification or alteration of pole, duct, conduit, or right-of-way

Whenever the owner of a pole, duct, conduit, or right-of-way intends to modify or alter such pole, duct, conduit, or right-of-way, the owner shall provide written notification of such action to any entity that has obtained an attachment to such conduit or right-of-way so that such entity may have a reasonable opportunity to add to or modify its existing attachment. Any entity that adds to or modifies its existing attachment after receiving such notification shall bear a proportionate share of the costs incurred by the owner in making such pole, duct, conduit, or right-of-way accessible.

(i) Costs of rearranging or replacing attachment

An entity that obtains an attachment to a pole, conduit, or right-of-way shall not be required to bear any of the costs of rearranging or replacing its attachment, if such rearrangement or replacement is required as a result of an additional attachment or the modification of an existing attachment sought by any other entity (including the owner of such pole, duct, conduit, or right-of-way).