# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-1683

_____

Ameren Corporation; American Electric Power Service Corporation; Centerpoint Energy Houston Electric, LLC; Virginia Electric and Power Company

*Petitioners*

v.

Federal Communications Commission; United States of America

*Respondents*

COMPTEL, doing business as INCOMPAS; Level 3 Communications; National Cable & Telecommunications Association; United States Telecom Association

*Intervenors*

------------------------------

Texas Industrial Energy Consumers; Texas Office of Public Utility Counsel

*Amici on Behalf of Petitioner*

_____

Petition for Review of an Order of the
Federal Communications Commission

_____

Submitted: January 11, 2017
Filed: July 31, 2017

_____

Before WOLLMAN, MURPHY, and COLLOTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Ameren Corporation; American Electric Power Service Corporation; CenterPoint Energy Houston Electric, LLC; and Virginia Electric and Power Company (collectively, Petitioners) petition for review of a November 2015 order of the Federal Communications Commission (FCC) governing the rates that utility companies may charge telecommunications providers for attaching their networks to utility-owned poles. The FCC, the United States, and intervenors COMPTEL d/b/a INCOMPAS; National Cable & Telecommunications Association; Level 3 Communications, LLC; and United States Telecom Association oppose the petition. We deny the petition.

I. Background

Under the Pole Attachments Act, 47 U.S.C. § 224, the FCC has the authority to ensure that rates for attachments to utility poles by providers of cable television services (cable providers) and providers of telecommunications services (telecommunications providers) are "just and reasonable." Id. § 224(b)(1). Section 224 initially applied only to cable providers. The statute sets forth a lower bound and an upper bound for "just and reasonable" rates. The lower bound is a rate that "assures a utility the recovery of not less than the additional costs of providing pole attachments," and the upper bound is a rate that is "determined by multiplying the percentage of the total usable space . . . which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole." Id. § 224(d)(1). The FCC set the rate for this upper bound (the Cable Rate) by multiplying three values: the space factor (the space occupied by an

attachment divided by the total usable space on the pole), the net cost of a bare pole, and a carrying charge rate.  47 C.F.R. § 1.1409(e)(1).

Congress amended § 224 in 1996, expanding it to cover pole attachments by telecommunications providers.  Section § 224(e) sets forth methods for apportioning the cost of a pole among telecommunications providers:

> (2) A utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.

> (3) A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space required for each entity.

Id. § 224(e).  This revision thus established a separate formula for determining the rate for pole attachments by telecommunications providers (the Telecom Rate).

Until 2011, the FCC determined "cost" for the Telecom Rate the same way as for the Cable Rate (net cost of a bare pole multiplied by a carrying charge rate), and implemented § 224(e)(2) by calculating the space factor differently, apportioning two-thirds of the costs of the unusable space among attaching telecommunications providers.  Thus, the Telecom Rate was typically higher than the Cable Rate, because the values for the net cost of a bare pole and the carrying charge rate were the same for both the Cable Rate and the Telecom Rate, while the value for the space factor was typically higher in the Telecom Rate because it included two-thirds of the unusable space on the pole.

In response to concerns that the risk of having to pay the Telecom Rate may have deterred cable providers from expanding their services, the FCC adopted an order in April 2011 designed to equalize the Cable and Telecom Rates. In the Matter of Implementation of Section 224 of the Act, Report and Order and Order on Reconsideration, 26 FCC Rcd. 5240 (2011) (the April 2011 Order). This Order reinterpreted the term "cost" in § 224(e)(2) by defining the "cost" for an urban-area pole as 66 percent of the pole's fully allocated costs (the net cost of a bare pole multiplied by the carrying charge rate), and for a non-urban-area pole as 44 percent of the pole's fully allocated costs. Id. at 5304, ¶ 149. Under the FCC's rebuttable presumptions of 5 attachers to an urban-area pole and 3 attachers to a non-urban-area pole, In the Matter of Implementation of Section 224 of the Act, Order and Further Notice of Proposed Rulemaking, 25 FCC Rcd. 11864, 11913, ¶ 119 n.324 (2010), the new Telecom Rate under the April 2011 Order approximated the Cable Rate.

The United States Court of Appeals for the District of Columbia Circuit upheld the April 2011 Order against claims that it was inconsistent with § 224. Am. Elec. Power Serv. Corp. v. FCC, 708 F.3d 183 (D.C. Cir.), cert. denied, 134 S. Ct. 118 (2013). The electric utilities' petition for review argued that "cost" in § 224(e) must mean the fully allocated costs of a pole, not the April 2011 Order's definition of "cost" as either 66 or 44 percent of the pole's fully allocated costs. Id. at 189. The D.C. Circuit noted that § 224(e) "is in important respects less specific than § 224(d)," because "while § 224(e) prescribes the apportionment criteria rather specifically, it nowhere defines the term 'cost.'" Id. at 188-89. Evaluating the April 2011 Order under the standard set forth in Chevron, USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the court held that the term "cost" as used in § 224(e) is ambiguous and that the FCC's interpretation of the statute was reasonable in light of its policy interest in eliminating market distortion caused by the difference between the Cable Rate and the Telecom Rate. Am. Elec. Power, 708 F.3d at 186, 189-90.

In November 2015, the FCC again altered the Telecom Rate, adopting the order at issue in this case. In the Matter of Implementation of Section 224 of the Act, Order on Reconsideration, 30 FCC Rcd. 13731 (2015) (the November 2015 Order). The FCC found that the April 2011 Order had failed to equalize the Telecom Rate and the Cable Rate, because utilities frequently rebutted the presumptions of 5 attachers in an urban area and 3 attachers in a non-urban area, which resulted in a higher Telecom Rate. Id. at 13738, ¶ 18. The FCC was also concerned that its recent order classifying retail broadband internet service as a telecommunications service, In the Matter of Protecting and Promoting the Open Internet, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601, 5734, ¶ 308 (2015), in conjunction with the continued disparity between the Cable Rate and the Telecom Rate, would lead to rate increases for cable providers offering broadband service. November 2015 Order at 13741, ¶ 21. Further, the FCC was concerned that, because some states that had elected to regulate pole attachments under 47 U.S.C. § 224(c) used the Cable Rate, a higher Telecom Rate would deter telecommunications investment in states where the FCC's Telecom Rate applied. Id. at 13741-42, ¶ 22. The November 2015 Order addressed these concerns by eliminating the distinction between poles in urban and non-urban areas, instead basing "cost" on the average number of attachers to a pole within an area: "cost" in areas with an average of 5 attachers is defined as 66 percent of fully allocated costs, 56 percent for 4 attachers, 44 percent for 3 attachers, and 31 percent for 2 attachers. Id. at 13756. In service areas where the average number of attachers is not a whole number, the percentage is interpolated from the percentages assigned to the nearest whole numbers. Id.

## II. Discussion

We review the FCC's interpretation of § 224(e) under the two-step framework set forth in Chevron. We first determine "whether Congress has directly spoken to the precise question at issue," and if it has, we "must give effect to the unambiguously

expressed intent of Congress." Chevron, 467 U.S. at 842-43. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. The agency's view "governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 218 (2009). Even when an agency policy represents a change from past policy, the agency generally need not demonstrate that "the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).

We conclude that the term "cost" in § 224 is ambiguous. "The fact is that without any better indication of meaning than the unadorned term, the word 'cost' in [a different statute], as in accounting generally, is 'a chameleon,' a 'virtually meaningless term.'" See Verizon Commc'ns, Inc. v. FCC, 535 U.S. 467, 500 (2002) (citations omitted). Indeed, § 224(d) uses the term "cost" in different ways. It sets forth as a lower bound "the additional costs of providing pole attachments." It sets forth as an upper bound a rate equal to the percentage of the pole's usable space occupied by the attachment multiplied by the "operating expenses and actual capital costs of the utility attributable to the entire pole." In § 224(e), by contrast, Congress did not specify what type of "cost" it meant, providing instead that, among telecommunications providers, the "cost" of providing usable space on a pole shall be apportioned according to the percentage of usable space required for each attacher, and the "cost" of providing unusable space on a pole shall be apportioned to each attacher such that its share equals two-thirds of the costs it would be allocated under an equal apportionment of such costs. Thus, while the Cable Rate under § 224(d) must fall within a range defined by two different, specified types of "cost," § 224(e) does not specify what type of "cost" must be used to determine the Telecom Rate.

Petitioners argue that the November 2015 Order defies Congress's intent to establish two different rates in § 224(d)(1) and § 224(e). We disagree that the statute evinces such an intent. Section 224(d) requires that pole attachment rates for cable providers fall within a certain range. Section 224(e) requires that pole attachment rates for telecommunications providers be calculated according to a certain formula. Because the term "cost" in § 224(e) is ambiguous, the same "cost" definition need not be used to determine the upper bound for cable rates under § 224(d) and the rate for telecommunications providers under § 224(e). Accordingly, the statute permits, but does not require, the Cable Rate and the Telecom Rate to diverge.

Likewise, we reject Petitioners' argument that the FCC's interpretation of the statute renders § 224(e) superfluous. See Corley v. United States, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004))). As set forth above, the statute allows the Cable Rate and the Telecom Rate to diverge, but does not require them to do so. Whether or not the rates diverge, the Cable Rate must fall within the range set forth in § 224(d) and the Telecom Rate must be calculated according to the formula set forth in § 224(e). Thus, the formula for calculating the Telecom Rate under § 224(e) is not superfluous.[1]

---

[1]In light of this conclusion, we need not address the FCC's argument that the alternative, cost-causation formula for determining the Telecom Rate under 47 C.F.R. § 1.1409(e)(2)(ii) prevents § 224(e) from becoming superfluous under the November 2015 Order.

We conclude that the November 2015 Order constitutes a reasonable interpretation of the ambiguity in § 224(e).[2]  The FCC sought to eliminate the disparity between the Cable and Telecom Rates in order to avoid subjecting cable providers offering broadband service to the higher Telecom Rate, and to avoid rate disparity between states whose pole attachment rates are regulated by the FCC and those states that had elected to regulate pole attachment rates using the Cable Rate even for telecommunications providers.  Finding that the April 2011 Order's presumptions of five attachers in urban areas and three attachers in non-urban areas were inadequate to achieve these goals, the FCC adopted the multiple cost allocators set forth in the November 2015 Order.  This approach represents a "reasonable policy" choice, and thus we defer to the FCC's interpretation.  See Verizon, 535 U.S. at 523.[3]

We find the D.C. Circuit's decision in American Electric Power to be persuasive.  Petitioners attempt to distinguish this case from American Electric Power, noting that, under the April 2011 Order upheld in that case, the Telecom Rate did not vary based on the number of attachers (instead varying based on urban or non-

---

[2]To the extent that Petitioners argue that the November 2015 Order resulted from arbitrary and capricious decision making in violation of the Administrative Procedure Act, 5 U.S.C. § 706, their argument fails for the same reasons that explain why the November 2015 Order is reasonable.  See Shays v. Fed. Election Comm'n, 414 F.3d 76, 96 (D.C. Cir. 2005) ("[O]ur inquiry at the second step of Chevron . . . overlaps with the arbitrary and capricious standard . . . ." (quoting Chamber of Commerce of the U.S. v. Fed. Election Comm'n, 76 F.3d 1234, 1235 (D.C. Cir. 1996))).

[3]Petitioners contend that "[t]here is simply no evidence in the record sufficient to support a determination" that equating the Telecom Rate and the Cable Rate will encourage the expansion of broadband services.  Pet'rs' Br. 39.  This claim is time-barred under 28 U.S.C. § 2344 in light of Petitioners' failure to challenge that determination within sixty days of the entry of the April 2011 order.

urban location); that the April 2011 Order adopted only two definitions of the term "cost," as opposed to the potentially infinite definitions in the November 2015 Order; and, "perhaps most importantly," that under the April 2011 Order it was at least possible for the Cable and Telecom Rates to diverge. Petr's' Br. 21-22. We conclude that those distinctions are of no significance. The D.C. Circuit concluded that the term "cost" was ambiguous and that the FCC's choice to define "cost" so as to equalize the Cable and Telecom Rates was reasonable. Am. Elec. Power, 708 F.3d at 188-90. That reasoning applies with equal force here.

The petition for review is denied.

_____