**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| FIRSTENERGY PENNSYLVANIA ELECTRIC COMPANY, | : | No. 42 MAP 2024 |
| | : | |
| Appellant | : | Appeal from the Order of the Commonwealth Court at No. 530 CD 2021 dated September 21, 2023, Affirming the decision of the Public Utility Commission at No. C-2020-3019347 dated April 15, 2021. |
| v. | : | |
| PENNSYLVANIA PUBLIC UTILITY COMMISSION, | : | ARGUED: May 13, 2025 |
| | : | |
| Appellee | : | |
| | | |
| FIRSTENERGY PENNSYLVANIA ELECTRIC COMPANY | : | No. 43 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the Commonwealth Court at No. 530 CD 2021 dated September 21, 2023, Affirming the decision of the Public Utility Commission at No. C-2020-3019347 dated April 15, 2021. |
| v. | : | |
| PENNSYLVANIA PUBLIC UTILITY COMMISSION | : | ARGUED: May 13, 2025 |
| | : | |
| CROSS APPEAL OF: VERIZON PENNSYLVANIA LLC AND VERIZON NORTH LLC | : | |

**OPINION**

**JUSTICE McCAFFERY**                    **DECIDED: January 8, 2026**

In its simplest terms, this appeal concerns the regulation of utilities and utility pole owners (generally electric distribution companies or landline phone companies), who

operate in a highly regulated environment. More specifically, the present dispute involves the recoupment of costs for leasing space on another company's utility poles.

## I. HISTORY AND IMPORTANT ACRONYMS

The issue before us arises from what is commonly known as a natural monopoly: wire transmission and distribution services. *See AT&T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 371 (1999). Poles, or underground tubes or tunnels, are required to keep transmission wires safely away from the flow of pedestrian and vehicular traffic. This case focuses specifically on poles.

For most of the first 100 years of the utility industry in the United States, telephone companies and electrical companies dominated the field of placement and maintenance of utility poles. From approximately 1900 to 1984, the United States' telephone industry was effectively a monopoly under AT&T (referred to as "Ma Bell" at the time), while the electrical industry involved local or regional monopolies. In a designated area, either a telephone utility or an electrical utility, but not both, would erect poles. The other utility, *i.e.*, the non-owner, would then contract with the pole owner to rent space — in essence, the utility that owned the poles would act as landlord to the utility that wished to attach its wires to the poles. The contracts, or leases, between the utilities are known as Joint Use Agreements, or JUAs. Notably, the Pennsylvania Public Utility Commission (PUC) infrequently regulated pole attachments under the Public Utility Code[1] in situations where parties could not amicably agree to JUAs or when there was some other public interest at stake (such as rate increases to customers).

Starting in the 1970s, cable television providers became interested in renting space on the poles erected by the existing utilities. In 1978, the United States Congress

---

[1] 66 Pa.C.S. §§ 101-3316.

passed the Pole Attachment Act (PAA)[2] to keep the incumbent utility monopolies from creating unreasonable obstacles to the cable companies' use of existing poles. *See Ameren Corp. v. F.C.C.*, 865 F.3d 1009, 1010 (8th Cir. 2017).

The PAA gave The Federal Communications Commission (FCC) the power to regulate pole attachment matters. However, the PAA allowed states to "reverse preempt" the FCC by filing a declaration that the state regulates pole attachments under its own laws. Pursuant to the PAA, the FCC promulgated regulations that lowered the rates that pole owners could charge cable companies. Importantly, the PAA originally only regulated the rates to be charged to cable companies — it made no attempt to regulate the rates AT&T and the electrical utilities could charge each other for pole attachments.

In 1984, AT&T's telephone monopoly was effectively dissolved. AT&T was allowed to maintain long-distance service over the wires, but local telephone service was broken up into what was popularly known as the "Baby Bells." Baby Bells were regional service providers that maintained a *de facto* monopoly over wire transmission in their specific region. This was a years-long process that did not immediately produce the desired result of a competitive market for phone services.

In 1996, Congress once again stepped in. Through the Telecommunications Act of 1996 (TA96),[3] Congress allowed the Baby Bells to participate in the long-distance telephone market. Further, TA96 allowed the Baby Bells to compete in the cable television market and allowed cable tv companies to compete in the local telephone service market. In return, the Baby Bells were required to provide meaningful access to their wired distribution services to encourage competition.

---

[2] 47 U.S.C. § 224.

[3] Telecommunications Act of 1996, Pub.L. 104-104, 110 State. 56, 47 U.S.C. § 151 *et seq*.

As an aside, TA96 first utilized several acronyms that are commonly referenced in this appeal. Baby Bells, as the residual *de facto* monopoly inheritors, are referred to as Incumbent Local Exchange Carriers, or ILECs. In contrast, any other companies seeking to provide local telephone services are referred to as Competitive Local Exchange Carriers, or CLECs. Much like the PAA sought to encourage competition by lowering costs to cable companies, TA96 sought to encourage competition in the landline phone market by lowering costs to CLECs through the establishment of a cost-based presumptive maximum attachment rate, known as the "Old Telecom Rate." However, that calculation was different from the calculation used for cable companies in the PAA (which TA96 did not affect). TA96 empowered the FCC to regulate this arena but still allowed for states to reverse preempt the FCC's regulation.

The next major milestone, and one that is directly relevant to the present matter, occurred in 2011. That year, the FCC published the 2011 Pole Attachment Order,[4] which proposed a "New Telecom Rate" for CLECs. The Old Telecom Rate, in the FCC's opinion, was too high and was inhibiting investment in rural broadband and other advanced services. Importantly, the FCC did not prescribe any maximum rate for ILECs, recognizing that, by virtue of their ownership of poles, they were not in the same position as CLECs. Nonetheless, the 2011 order allowed ILECs to challenge pole attachment rates charged by other utilities.

In 2018, the FCC expanded the reach of the "New Telecom Rate" to include ILECs. Pursuant to the 2018 guidance, the presumed just and reasonable rate for ILECs was the New Telecom Rate, even for JUAs between ILECs and utilities. Utilities could overcome this presumption only by showing, through clear and convincing evidence, that an ILEC

---

[4] 26 FCC Rcd. 5240 (F.C.C.), 26 F.C.C.R. 5240, 52 Communications Reg. (P&F) 1027, 2011 WL 1341351.

received net benefits through the JUA that materially advantaged the ILEC over other telecommunications providers.

The PUC consistently deferred to the FCC from 1978 to 2020. In 2020, the PUC certified that it had assumed jurisdiction over pole attachments, reverse preempting the FCC. At the same time, the PUC adopted several FCC regulations wholesale, while claiming that other FCC precedents were only of persuasive value in the PUC regulatory scheme. Most importantly, the PUC adopted the FCC's New Telecom Rate presumption in favor of ILECs.

## II. THE PRESENT CASE

The PUC first proposed the new regulations and reverse preemption through a 2019 Rulemaking Order, filed on September 3, 2019. Not quite 60 days later, Verizon initiated the instant case by filing an action with the FCC, seeking to gain the benefit of the New Telecom Rate in its JUAs with FirstEnergy (an electrical utility and pole owner).

The essential facts here are undisputed. Verizon and their predecessors negotiated JUAs with FirstEnergy's predecessors, at least as early as 1967. Because both parties to the JUAs owned poles, the JUAs set forth a reciprocal per pole rate that applied to both parties. The JUAs also set forth an offset mechanism for netting the payments due. Against this backdrop, Verizon filed a pole attachment complaint (Complaint) with the FCC, against FirstEnergy, on November 20, 2019. In its Complaint, Verizon claimed the negotiated rates FirstEnergy charged Verizon, per the JUAs, were unjust and unreasonable, per Section 224 of the PAA[5] and the FCC's implementing

---

[5] Section 224(b) of the PAA states, in pertinent part:

(b) Authority of Commission to regulate rates, terms, and conditions; enforcement powers; promulgation of regulations

(continued…)

regulations and orders. Verizon claimed that the pole attachment rates should be comparable to the New Telecom Rates that FirstEnergy charges the CLECs and cable companies under pole attachment license agreements. In addition, Verizon contended it was entitled to a refund equal to the difference between the rates it paid and the New Telecom Rates it should have paid since July 12, 2011, *i.e.*, the effective date of the 2011 Pole Attachment Order, plus interest. FirstEnergy filed an Answer denying all material allegations in the Complaint and raising affirmative defenses, which Verizon answered.

Before the FCC could decide the case, the PUC filed its reverse preemption order, and on March 23, 2020, the FCC transferred the case to the PUC. The PUC referred the matter to one of its administrative law judges (ALJ) for adjudication.

Before the ALJ, the parties submitted a Joint Statement, which included the following stipulated facts, among others: (1) Verizon and FirstEnergy[6] are parties to 10 substantially similar JUAs; (2) the JUAs were entered into with Verizon's predecessor companies from 1958 to 1988 and were amended between 1999 and 2009 to include the current pole attachment rate provisions; (3) 2018 is the most recent year that all three subsidiaries of FirstEnergy invoiced and collected annual pole attachment rental fees from Verizon; (4) the 2018 invoices cover 412,697 poles jointly used by the parties, with

---

(1) Subject to the provisions of subsection (c) of this section, the Commission shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable, and shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions. For purposes of enforcing any determinations resulting from complaint procedures established pursuant to this subsection, the Commission shall take such action as it deems appropriate and necessary, including issuing cease and desist orders, as authorized[.]

47 U.S.C. § 224(b).

[6] FirstEnergy's Distribution Companies include Met-Ed, Penn Power, and Penelec.

FirstEnergy owning 301,854 of them and Verizon owning 110,843 of them; (5) Met-Ed sends Verizon five annual invoices based on four Memoranda of Understanding from 2009; (6) Penn Power and Verizon send each other one annual invoice based on an amendment to the JUA entered into in 1999; (7) per the Penelec and Penn Power JUAs, each party pays a per-pole rate for use of the other party's poles (by contrast, under the Met-Ed JUA, Met-Ed charges Verizon an "annual Deficiency Rate rental fee" for "deficiency poles," which is the difference between the number of joint use poles Verizon owns (19%) and the higher number of joint use poles Verizon would own if it owned 45% of the joint use poles. For purposes of comparison, the annual Deficiency Rate rental fee Met-Ed charges can be converted into "reciprocal" per-pole rental rates that can be calculated based on the assumption that both parties charge the same per-pole rental rate for use of the other party's poles; (8) the parties agreed to the monthly and annual rates FirstEnergy companies had charged between 2011 and 2019. All other facts remained in dispute. *See Verizon Pa. LLC v. Pa. Pub. Util. Comm'n*, 303 A.3d 219, 228 (Pa. Cmwlth. 2023).

In lieu of in-person hearings due to the COVID-19 pandemic, the parties offered a Joint Motion to Admit Stipulated Items into the record followed by briefs in support of their respective arguments. Based on these stipulated facts, evidence, and the arguments presented, the ALJ concluded that Verizon satisfied its burden of proving it was entitled to a rebuttable presumption to the attachment rates set by the New Telecom Rate. *See Verizon*, 303 A.3d at 229. The ALJ determined FirstEnergy failed to rebut this presumption by showing Verizon receives a material advantage per the terms of the JUAs. Because FirstEnergy charged Verizon a rate other than the New Telecom Rate to attach to FirstEnergy's poles, the ALJ found that, as of July 12, 2011, FirstEnergy failed to charge Verizon a just, reasonable, and competitively neutral rate for its use of space

on FirstEnergy's poles, as required by law. Thus, the ALJ recommended that Verizon's Complaint be granted in part and denied in part.[7] As a remedy, the ALJ recommended FirstEnergy reduce rates moving forward using the New Telecom Rate and refund amounts it collected in violation of the law as of March 11, 2019, which was the effective date of the rates established under the New Telecom Rate methodology.

Both parties filed exceptions to the ALJ's recommended decision with the PUC, which filed a decision on December 18, 2020, granting in part and denying in part the parties' exceptions and adopting the ALJ's recommended decision as modified.

The PUC agreed with the ALJ that FirstEnergy charged unlawfully high rates and must reduce its rates to the lawful level and refund the excess amounts it collected from Verizon. The PUC found that the New Telecom Rate is the just and reasonable competitively neutral rate required by the PUC's regulations. In addition, the PUC determined that Verizon's use of FirstEnergy's poles under the JUAs is comparable to, and in other ways disadvantageous relative to, its competitors' use of the same poles. Thus, the PUC concluded Verizon should pay the same New Telecom Rate guaranteed to its competitors. The PUC also determined it had the authority to set lawful rates and award refunds of amounts collected in violation of the law. The PUC modified the ALJ's decision by adopting November 20, 2019,[8] rather than March 11, 2019, as the effective date of the refund. FirstEnergy petitioned for review by the Commonwealth Court, and Verizon cross-appealed, arguing a single issue regarding the date to which its refund claim was retroactive.

---

[7] Critical to our inquiry here, the ALJ determined that Verizon was entitled to a refund as of March 11, 2019 (the effective date of the rates established under the New Telecom Rate methodology), rather than July 12, 2011 (the effective date of the 2011 Pole Attachment Order), or in the alternative, November 20, 2015 (four years preceding the date Verizon filed its Complaint), as requested by Verizon.

[8] The date on which Verizon filed its Complaint with the FCC.

## III. REVIEW BY THE COMMONWEALTH COURT

FirstEnergy presented ten issues for review by the Commonwealth Court on the basis that the PUC erred, abused its discretion, and made findings that were unsupported by substantial evidence. Verizon challenged the PUC's decision based only on its determination that November 20, 2019, was the proper date to use for its refund. Verizon asserted that it was entitled to a refund from July 12, 2011 — the date the FCC required electric utility pole owners to provide just and reasonable rates that are competitively neutral. Alternatively, Verizon sought a refund from November 2015, because the applicable statute of limitation in the Public Utility Code allows a party to seek a refund four years prior to the date of filing its Complaint.

Before the Commonwealth Court, FirstEnergy argued: (1) the PUC erred in determining its existing pole attachment rates were unjust and unreasonable without taking into consideration the cost of service; (2) the PUC improperly applied the FCC's regulations in a manner inconsistent with FCC precedent; (3) the PUC used an unlawful evidentiary framework in reaching its determination that Verizon should receive the reduced New Telecom Rate; (4) the PUC incorrectly calculated the New Telecom Rate; (5) the consequence of the PUC's determination is a "secret rate increase" for FirstEnergy's electric customers; (6) the PUC improperly based its decision on policy considerations that Verizon and other providers that benefit from pole attachment rate reductions will commit a portion of their savings to make broadband more available and affordable throughout Pennsylvania; (7) the PUC erred by directing the parties to insert the New Telecom Rate into the existing JUAs and by failing to direct the removal of advantageous terms; (8) the PUC erred and abused its discretion by awarding refunds to Verizon; (9) the PUC violated Section 1312(a) of the Public Utility Code, 66 Pa.C.S. §

1312(a),[9] by not stating the exact amount to be paid by FirstEnergy; and (10) the PUC erred by failing to grant FirstEnergy's request to create a regulatory asset and defer any refunds and reduced rates for future rate recovery. *See Verizon*, 303 A.3d at 231-244.

At the outset, the Commonwealth Court majority noted the PUC adopted the FCC's pole attachment rate regulations, providing that "a 'rate is just and reasonable' [if] it assures a utility the recovery of not less than the additional costs of providing pole attachments. …" *Verizon*, 303 A.3d at 232 (citation omitted). Thus, the majority determined FirstEnergy's first argument, that the PUC was required to consider fully allocated costs in the New Telecom Rate, ignored the regulatory language. *See id*. Accordingly, the majority concluded "the PUC did not ignore precedent or arguments about cost of service and fully allocated costs." *Id*. at 233. As to FirstEnergy's second argument — the PUC improperly applied the FCC's regulations in a manner inconsistent with FCC precedent — the majority determined that such precedent is not binding on the PUC's adjudicatory process in pole attachment matters. *See id*.

The Commonwealth Court majority next concluded that the PUC did not err or abuse its discretion by finding FirstEnergy failed to meet its evidentiary burden because it did not show that the purported benefits Verizon receives under the JUAs materially

---

[9] Section 1312(a) states, in pertinent part:

General rule. – If, in any proceeding involving rates, the commission shall determine that any rate received by a public utility was unjust or unreasonable, or was in violation of any regulation or order of the commission, or was in excess of the applicable rate contained in an existing and effective tariff of such public utility, the commission shall have the power and authority to make an order requiring the public utility to refund the amount of any excess paid by any patron, in consequence of such unlawful collection, within four years prior to the date of the filing of the complaint, together with interest at the legal rate from the date of each such excessive payment.

66 Pa.C.S. § 1312(a).

advantaged Verizon over other pole "attachers;" therefore, Verizon was entitled to the New Telecom Rate. *See Verizon, 303* A.3d at 233-237*. Further, the majority concluded the PUC properly determined the New Telecom Rate must be calculated using the regulatory presumptions, not those offered instead by FirstEnergy. *See id*. at 239. In addition, the majority declined to speculate whether the PUC's application of the New Telecom Rate would trigger a rate increase for FirstEnergy's electric customers. This is because a base rate proceeding, not a pole attachment complaint case between utilities, would be the proper forum to consider the interests of FirstEnergy's customers. *See id*.

The Commonwealth Court majority rejected FirstEnergy's sixth argument that the PUC improperly based its decision on policy considerations of making broadband more available throughout the Commonwealth, concluding, instead, that the PUC's determination was based on the law and record evidence that FirstEnergy charged Verizon more than the lawful rate. *See Verizon,* 303 A.3d at 239-240. Similarly, the majority rejected FirstEnergy's contention "that the PUC erred by directing the parties to insert the New Telecom Rate into the existing JUAs and by failing to direct the removal of advantageous terms." *Id*. at 240. The majority determined that the PUC properly exercised its statutory and regulatory authority by amending the terms of the JUAs to reflect the New Telecom Rate, rather than modifying the other contractual terms that it did not find were unjust, unreasonable, or adverse to the public's interest. *See id*. at 240-241.

The Commonwealth Court majority then addressed FirstEnergy's eighth argument that the PUC erred and abused its discretion by awarding refunds to Verizon. The majority concluded that 66 Pa.C.S. § 1312(a)[10] permits refunds to address the unlawful

_____

[10]Section 1312(a) states, in pertinent part:

(continued…)

collection of rates received by a public utility within four years prior to the date the Complaint was filed. Further, the majority explained that a properly awarded refund based on just and reasonable rates does not amount to an unlawful taking. Accordingly, the majority concluded that the PUC did not err or abuse its discretion by awarding refunds to Verizon. *See Verizon, 303* A.3d at 241-243. In a related determination, the majority also rejected FirstEnergy's ninth argument, which was that the PUC violated Section 1312(a) of the Public Utility Code by not stating the exact amount to be paid by FirstEnergy to Verizon. The majority determined that the PUC stated the amount of the refund in formulaic terms, *i.e.*, the difference between the rate paid under the JUAs and the New Telecom Rate, for an exact period of time, plus interest. *See id*. at 244. In addition, the PUC directed that the refund to Verizon should be prorated. *See id*. Thus, the majority held that because the formula produces an exact amount to be paid, the PUC did not violate the Public Utility Code's provision, or improperly delegate its authority, when it directed the parties to perform the calculations themselves using the formula. *See id*.

Finally, the Commonwealth Court majority addressed FirstEnergy's argument that the PUC erred by failing to grant FirstEnergy's request to create a regulatory asset and defer any refunds and reduced rates for future rate recovery. The majority determined that the PUC is not required to create a regulatory asset in the context of this proceeding,

General rule. – If, in any proceeding involving rates, the commission shall determine that any rate received by a public utility was unjust or unreasonable, or was in violation of any regulation or order of the commission, or was in excess of the applicable rate contained in an existing and effective tariff of such public utility, the commission shall have the power and authority to make an order requiring the public utility to refund the amount of any excess paid by any patron, in consequence of such unlawful collection, within four years prior to the date of the filing of the complaint, together with interest at the legal rate from the date of each such excessive payment.

66 Pa.C.S. § 1312(a).

and the reductions in pole attachment rates are not the direct result of a PUC action but, instead, are the direct result of FirstEnergy maintaining inflated rates for nearly a decade after the regulatory change. *See Verizon,* A.3d at 244-245. Thus, the majority concluded "the PUC did not err or abuse its discretion by denying FirstEnergy's request for the creation of a regulatory asset in the context of [a] pole rate attachment proceeding." *Id*. at 245.

For its part, Verizon argued that the PUC erred as a matter of law when it selected November 20, 2019, as the effective date of the refund. The Commonwealth Court majority explained that the PUC has discretion to establish a refund period that is less than the full length applied by the applicable statute of limitations, the Public Utility Code empowers the PUC to issue refunds within four years prior to the date the complaint is filed, and the PUC's regulations provide that the PUC may order a refund if appropriate, consistent with the applicable statute of limitations. *See Verizon,* A.3d at 245. The majority concluded that because the PUC is not required to award refunds, the decision to do so for any period within the statute of limitations is within the PUC's discretion. *See id*. Thus, simply because the PUC **could have** chosen a different refund period, the decision it made, here, did not constitute an abuse of discretion.

Judge Wallace wrote a concurring opinion. She noted that because Verizon was entitled to a refund under the law, the Commonwealth Court could not reach a contrary result over concern for FirstEnergy's customers or a suspicion that Verizon would simply pocket the refund rather than expand broadband access throughout the Commonwealth. *See Verizon,* 303 A.3d at 248 (Wallace, J., concurring).

President Judge Cohn Jubelirer authored a dissent, joined by Judge McCullough. In the dissent's view, the PUC's decision violated the Public Utility Code and settled principles of public utility law. *See Verizon,* 303 A.3d at 246 (Cohn Jubelirer, P.J.,

dissenting). Specifically, the dissent asserted the PUC adopted the FCC's regulations, in full, without regard to whether they were consistent with the Code and Pennsylvania law on ratemaking. *See id.* The dissent explained that while the Code places the burden of proof on a complainant seeking relief from the PUC, the adopted regulations improperly shifted the burden of proof to the utility – requiring it to show that its existing rates are just and reasonable. *See id.* at 247. The dissent thus agreed with FirstEnergy that the adopted regulations conflict with the Code and Pennsylvania precedent and, therefore, must fail.

The dissent also questioned whether the adopted regulations, and the PUC's opinion, abandoned the "polestar" of utility ratemaking in Pennsylvania, *i.e.*, the cost of service. *See Verizon, 303* A.3d at 247. The dissent indicated that by focusing on something other than cost of service in determining the reasonableness of existing pole rates, the adopted regulations, and the PUC's decision, were inconsistent with precedent. *See id.*

Finally, the dissent expressed concern that the PUC's holding would result in increased base rates for FirstEnergy's customers, noting the PUC must consider FirstEnergy's customers in its adopted regulations pursuant to 47 U.S.C. § 224©(2).[11]

---

[11] Section 224 (c) states:

**(c)** State regulatory authority over rates, terms, and conditions; preemption; certification; circumstances constituting State regulation

**(1)** Nothing in this section shall be construed to apply to, or to give the Commission jurisdiction with respect to rates, terms, and conditions, or access to poles, ducts, conduits, and rights-of-way as provided in subsection (f), for pole attachments in any case where such matters are regulated by a State.

**(2)** Each State which regulates the rates, terms, and conditions for pole attachments shall certify to the Commission that —

**(A)** it regulates such rates, terms, and conditions; and

(continued…)

*See Verizon, 303* A.3d at 247. The dissent noted the PUC's decision did not analyze the impact it would have on FirstEnergy's electric customers, on whom it believed the recoupment of FirstEnergy's lost rates would likely fall. *See id*. According to the dissent, it was unclear whether Verizon would pass on its savings to its customers or use them to increase broadband services in Pennsylvania. *See id*. Thus, the PUC's decision, and the majority's affirmance thereof, created troubling precedent that would likely result in a windfall for Verizon shareholders paid for by FirstEnergy's ratepayers. *See id*. The dissent added that while the policy concerns for expanding broadband was laudable, the PUC's hope that Verizon would act in furtherance thereof was misplaced. *See id*. Accordingly, the dissent insisted the PUC's decision should be reversed.

Based on the foregoing, the Commonwealth Court affirmed the order of the PUC. FirstEnergy filed a petition for allowance of appeal with this Court, and Verizon filed a cross-petition, both of which were granted.


## IV. ISSUES

We accepted allocatur review on the following issues raised by FirstEnergy:

(1) Did the PUC violate and exceed its authority under Sections 332(a), 701, 1301, 1304, and 1309 of the Pennsylvania Public Utility Code and fail to follow long-standing judicial precedent when it adopted and applied the FCC's pole attachment regulations to determine that the existing rates charged to Verizon under the Joint Use Agreements are unjust and unreasonable without any consideration of the cost of providing service?

(2) Did the PUC violate federal law at 47 U.S.C. § 224(c)(2)(B) and fail to follow its own regulations at 52 Pa. Code § 77.3(b) when it failed to consider the

---

**(B)** in so regulating such rates, terms, and conditions the State has the authority to consider and does consider the interests of the subscribers of the services offered via such attachments, as well as the interests of the consumers of the utility services.

47 U.S.C. § 224(c).

interests of the FirstEnergy Companies' electric customers, where the rate reduction and refunds awarded to Verizon in this proceeding will inevitably and substantially increase the rates paid by FirstEnergy Companies' customers?

(3) Did the PUC violate the Public Utility Code when it awarded Verizon refunds based on the difference between existing rates and the New Telecom Rate, where Verizon failed to demonstrate that the existing rates charged to Verizon under the Joint Use Agreements are unjust and unreasonable under Pennsylvania law, and where the PUC lacks the constitutional and statutory authority to retroactively modify the Joint Use Agreements?

*Metro. Edison Co. v. Pennsylvania Pub. Util. Comm'n*, 320 A.3d 84 (Pa. 2024).

We also accepted allocatur review on the following issue raised by Verizon in its cross-petition for allowance of appeal:

(1) Whether, in an issue of first impression in Pennsylvania with substantial statewide importance, a PUC refund award must be consistent with the applicable statute of limitations, as the PUC's regulations expressly require, when the PUC has found that a refund is warranted because an electric utility charged and collected unlawfully high pole attachment rates.

*Id.*

Because the first issue raised by FirstEnergy is dispositive, we do not reach the other issues.

## V. LEGAL BACKGROUND

This appeal involves the interplay of a multitude of statutory authority. We begin by summarizing the most salient of that authority. First is Section 501 of the Public Utility Code, which enunciates the general powers of the PUC as follows:

**(a) Enforcement of provisions of part.--**In addition to any powers expressly enumerated in this part, the commission shall have full power and authority, and it shall be its duty to enforce, execute and carry out, by its regulations, orders, or otherwise, all and singular, the provisions of this part, and the full intent thereof; and shall have the power to rescind or modify any such regulations or orders. The express enumeration of the powers of the

commission in this part shall not exclude any power which the commission would otherwise have under any of the provisions of this part.

**(b) Administrative authority and regulations.--**The commission shall have general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth. The commission may make such regulations, not inconsistent with law, as may be necessary or proper in the exercise of its powers or for the performance of its duties.

**(c) Compliance.--**Every public utility, its officers, agents, and employees, and every other person or corporation subject to the provisions of this part, affected by or subject to any regulations or orders of the commission or of any court, made, issued, or entered under the provisions of this part, shall observe, obey, and comply with such regulations or orders, and the terms and conditions thereof.

66 Pa.C.S. § 501.

As to complaints raised before the PUC, Section 701 of the Public Utility Code states:

The commission, or any person, corporation, or municipal corporation having an interest in the subject matter, or any public utility concerned, may complain in writing, setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, of any law which the commission has jurisdiction to administer, or of any regulation or order of the commission. Any public utility, or other person, or corporation likewise may complain of any regulation or order of the commission, which the complainant is or has been required by the commission to observe or carry into effect. The Commonwealth through the Attorney General may be a complainant before the commission in any matter solely as an advocate for the Commonwealth as a consumer of public utility services. The commission may prescribe the form of complaints filed under this section.

66 Pa.C.S. § 701. Critically, Section 332(a) of the Public Utility Code sets forth the respective burden of proof for the parties. It reads "[e]xcept as may be otherwise provided in section 315 … or other provisions of this part or other relevant statute, **the proponent of a rule or order has the burden of proof**." 66 Pa.C.S. § 332(a) (emphasis added).

Chapter 13, Subchapter A, of the Public Utility Code, governs rates. Notably, Section 1301(a) reads:

**Regulation.--**Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission. …

66 Pa.C.S. § 1301(a).

In addition, Section 1304 provides, in pertinent part:

**No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage.** No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service.

66 Pa.C.S. § 1304 (emphasis added).

Further, Section 1308(d) of the Public Utility Code reads:

**General rate increases.--Whenever there is filed with the commission by any public utility** described in paragraph (1)(i), (ii), (vi) or (vii) of the definition of "public utility" in section 102 (relating to definitions), and such other public utility as the commission may by rule or regulation direct, **any tariff stating a new rate which constitutes a general rate increase, the commission shall promptly enter into an investigation and analysis of said tariff filing and may by order setting forth its reasons therefor, upon complaint or upon its own motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate**, and the commission may, at any time by vote of a majority of the members of the commission serving in accordance with law, permit such tariff to become effective, except that absent such order such tariff shall be suspended for a period not to exceed seven months from the time such rate would otherwise become effective. Before the expiration of such seven-month period, a majority of the members of the commission serving in accordance with law, acting unanimously, shall make a final decision and order, setting forth its reasons therefor, granting or denying, in whole or in part, the general rate increase requested.  If, however, such an order has not been made at the expiration of such seven-month period, the proposed general rate increase shall go into effect at the end of such period, but the commission may by order require the interested public utility to refund, in accordance with section 1312 (relating to refunds), to the persons in whose behalf such amounts were paid, such portion of such increased rates as by its decision shall be found not justified, plus interest, which shall be the average rate of interest specified for residential mortgage lending by the Secretary of Banking in accordance with the act of January 30, 1974 (P.L.13, No.6),

referred to as the Loan Interest and Protection Law, during the period or periods for which the commission orders refunds. The rate in force when the tariff stating such new rate was filed shall continue in force during the period of suspension unless the commission shall grant extraordinary rate relief as prescribed in subsection (e). The commission shall consider the effect of such suspension in finally determining and prescribing the rates to be thereafter charged and collected by such public utility, except that the commission shall have no authority to prescribe, determine or fix, at any time during the pendency of a general rate increase proceeding or prior to a final determination of a general rate increase request, temporary rates as provided in section 1310, which rates may provide retroactive increases through recoupment. As used in this part general rate increase means a tariff filing which affects more than 5% of the customers and amounts to in excess of 3% of the total gross annual intrastate operating revenues of the public utility. If the public utility furnishes two or more types of service, the foregoing percentages shall be determined only on the basis of the customers receiving, and the revenues derived from, the type of service to which the tariff filing pertains.

66 Pa.C.S. § 1308(d) (emphasis added).

Finally, for our purposes here, we note that Section 1309(a) of the Public Utility Code reads in pertinent part:

**General rule.--**Whenever the commission, after reasonable notice and hearing, upon its own motion or upon complaint, finds that the existing rates of any public utility for any service are unjust, unreasonable, or in anywise in violation of any provision of law, the commission shall determine the just and reasonable rates, including maximum or minimum rates, to be thereafter observed and in force, and shall fix the same by order to be served upon the public utility, and such rates shall constitute the legal rates of the public utility until changed as provided in this part. Whenever a public utility does not itself produce or generate that which it distributes, transmits, or furnishes to the public for compensation, but obtains the same from another source, the commission shall have the power and authority to investigate the cost of such production or generation in any investigation of the reasonableness of the rates of such public utility.

66 Pa.C.S. § 1309(a).

As this appeal is based on the actions of the PUC, a Pennsylvania administrative agency, a summary of administrative law, and specifically utility law, that guides our review is necessary. In *Feingold v. Bell of Pa.*, 383 A.2d 791, 794 (Pa. 1977), this Court

held that an administrative agency has only those powers granted to it by the Legislature and those that arise by necessary implication. In *Tire Jockey Serv., Inc. v. Com., Dep't. of Env't Prot.*, 915 A.2d 1165, 1186 (Pa. 2007), we set out a three-part test for assessing whether an administrative regulation is enforceable. That test is as follows: when an agency adopts a regulation pursuant to its legislative rule-making power, as opposed to its interpretive rule-making power, it is valid and binding upon the courts as long as it is (1) adopted within the agency's granted power, (2) issued pursuant to proper procedure, and (3) reasonable. *See id*.

As to whether a rate charged by a utility is just and reasonable, this Court, in *Duquesne Light Co. v. Pub. Serv. Comm'n*, 117 A. 63, 66 (Pa. 1922) (*Duquesne Light I*), held that under the Public Services Company Law, there is a presumption that **an existing rate is just and reasonable**. In *Shenango Twp. Bd. of Sup'rs v. Pa. Pub. Util. Comm'n*, 686 A.2d 910, 914 (Pa. Cmwlth. 1996), the Commonwealth Court held that "a complainant seeking to evade the effect of an existing tariff provision carries a very heavy burden to prove that the facts and circumstances have changed so drastically as to render the application of the tariff provision unreasonable." Similarly, in *Duquesne Light Co. v. Pa. Pub. Util. Comm'n*, 715 A.2d 540, 544 (Pa. Cmwlth. 1998) (*Duquesne Light II*), the Commonwealth Court concluded that the customer has the burden to establish that an existing rate is no longer reasonable and that the absence of such a showing establishes *prima facie* evidence of the facts found in the prior order.

In *Welch v. Pa. Pub. Util. Comm'n*, 464 A.2d 568 (Pa. Cmwlth. 1983), the Commonwealth Court determined that "[i]n order to prove [unreasonable] discrimination [of rates under 66 Pa.C.S. § 1304,] the [complainant] must show that [the public utility] 'was bent on collecting more than a reasonable rate from [complainant] … for the purpose of supplying a deficiency created by inadequate rates charged to other customers.'"

*Welch*, 464 A.2d 574 (*citing Park Towne v. Pa. Publ. Util. Comm'n*, 433 A.2d 610, 614 (Pa. Cmwlth. 1981)). Later, in *Lloyd v. Pa. Pub. Utility Comm'n*, 904 A.2d 1010, 1020 (Pa. Cmwlth 2006), a case about electricity transmission rates, the Commonwealth Court criticized the PUC's analysis "that the principle of gradualism[,]" *i.e.*, the concept of passing rate increases to customers using multiple small increases instead of one big increase, "trumps all other ratemaking concerns – especially the polestar – cost of providing service."

## VI. ARGUMENTS OF THE PARTIES

### A. FirstEnergy

FirstEnergy argues that the PUC violated the Public Utility Code and exceeded its authority by adopting and applying the FCC's pole attachment regulations to determine that existing rates for utility service were unjust and unreasonable without consideration of the cost of providing service. *See* FirstEnergy's Brief at 27. Noting that the PUC only has the powers that are expressly conferred upon it by the General Assembly, FirstEnergy explains that the PUC cannot violate its enabling statute. *See id*. Further, the Public Utility Code prohibits the PUC from adopting regulations that are inconsistent with its provisions. *See id*.

FirstEnergy states that the Public Utility Code requires public utility rates to be just and reasonable. *See* 66 Pa.C.S. § 1301(a). "Existing rates, such as those in the [JUAs], are considered *per se* just and reasonable." FirstEnergy's Brief at 28. Sections 332(a) and 1309 of the Public Utility Code make it plain that a complainant has the burden of proving the existing rates it pays are unjust and unreasonable. Further, FirstEnergy points out that Section 1304 of the Public Utility Code makes it clear the complainant also

"has the burden to show that a public utility is charging unduly discriminatory rates to the complainant to subsidize other customers or customer groups." *Id*. at 28-29.

FirstEnergy argues that the PUC and the Commonwealth Court flipped the burden of proof required by the Public Utility Code. *See* FirstEnergy's Brief at 29. FirstEnergy asserts that complainant, Verizon, made no showing regarding the unjustness and unreasonableness of the existing rates. However, it agrees the PUC cannot avoid this requirement of the Public Utility Code by simply claiming it adopted regulations that allow otherwise. FirstEnergy maintains that the PUC did not require Verizon to demonstrate the existing JUA rates were unjust and unreasonable on a cost-of-service basis, as required, noting that "cost of service is the 'polestar' of public utility ratemaking in Pennsylvania." FirstEnergy's Brief at 30. FirstEnergy adds that, instead, Verizon was only required to show the JUAs were entered into, or renewed, after March 11, 2019.

FirstEnergy maintains that the PUC's regulations "set forth a flawed and unlawful two-step process for determining whether an ILEC should receive reduced pole attachment rates." FirstEnergy's Brief at 33. It summarizes the process as follows: Step 1, Verizon must prove that the JUAs were entered into or renewed after the effective date of 47 C.F.R. § 1.1413.[12] If so, Step 2 requires FirstEnergy to prove by clear and

---

[12] 47 C.F.R. § 1.1413 reads:

§ 1.1413 Complaints by incumbent local exchange carriers.

(a) A complaint by an incumbent local exchange carrier (as defined in 47 U.S.C. 251(h)) or an association of incumbent local exchange carriers alleging that it has been denied access to a pole, duct, conduit, or right-of-way owned or controlled by a local exchange carrier or that a utility's rate, term, or condition for a pole attachment is not just and reasonable shall follow the same complaint procedures specified for other pole attachment complaints in this part.

(b) In complaint proceedings challenging utility pole attachment rates, terms, and conditions for pole attachment contracts entered into or renewed after the effective date of this section, there is a presumption that an incumbent local exchange carrier (or an (continued…)

convincing evidence that the JUAs provide Verizon with material advantages over its CLEC and cable competitors. If FirstEnergy fails to do so, Verizon receives the New Telecom Rate. If FirstEnergy meets its burden, Verizon receives no more than the Old Telecom Rate, which is a middle ground between existing rates and the New Telecom Rate. FirstEnergy asserts that using this framework, the PUC and the Commonwealth Court erroneously focused on Step 1 and concluded that because the JUAs were entered into or renewed after the effective date of 47 C.F.R. § 1.1413, the existing rates are unjust and unreasonable, and the New Telecom Rate is just and reasonable. *See* FirstEnergy's Brief at 34. However, FirstEnergy adds that the PUC was required to consider the **cost of service** as part of its determination that the existing rates are unjust and unreasonable. *See id.*

As FirstEnergy puts it:

> [T]he process set forth in the FCC's regulations, which was adopted by the PUC and the Commonwealth Court, does not consider the cost of service at all and unlawfully allows another consideration (*i.e.*, whether the contract is new or renewed) to trump the cost of service. This violates the Public Utility Code and *Lloyd*, and provides an unlawful, unnecessary, and undisclosed financial windfall to Verizon, that will be shouldered by

association of incumbent local exchange carriers) is similarly situated to an attacher that is a telecommunications carrier (as defined in 47 U.S.C. 251(a)(5) or a cable television system providing telecommunications services for purposes of obtaining comparable rates, terms, or conditions. In such complaint proceedings challenging pole attachment rates, there is a presumption that incumbent local exchange carriers (or an association of incumbent local exchange carriers) may be charged no higher than the rate determined in accordance with § 1.1406(d)(2). A utility can rebut either or both of the two presumptions in this paragraph (b) with clear and convincing evidence that the incumbent local exchange carrier receives benefits under its pole attachment agreement with a utility that materially advantages the incumbent local exchange carrier over other telecommunications carriers or cable television systems providing telecommunications services on the same poles.

47 C.F.R. § 1.1413.

[FirstEnergy] PA's customers.  Therefore, the PUC's … Order should be reversed.

FirstEnergy's Brief at 34.

FirstEnergy next argues that "[t]he PUC did not consider, and Verizon did not present, any evidence that satisfied the statutory burden of proof[.]"  FirstEnergy's Brief at 35.  FirstEnergy states that it is not asking this Court to reweigh the evidence presented before the PUC, it is asking the Court to recognize that the PUC had no evidentiary basis, under the Public Utility Code, to award Verizon the relief it sought.  *See id*. at 35.

FirstEnergy points out that Verizon did not present any facts or evidence regarding the cost of service provided by FirstEnergy, noting that Verizon's main brief submitted after the PUC hearing not only contained no cost-of-service evidence, it failed to cite any provision of the Public Utility Code, or to any PUC or other appellate precedent, in support of its claim.  On the other hand, FirstEnergy states that it presented unrebutted evidence that the rates Verizon pays under the JUAs, which were established via negotiation by the parties before the FCC first asserted jurisdiction over JUAs between ILECs and EDCs in 2011, are lower than the fully allocated cost of service.  *See* FirstEnergy's Brief at 36.  Based on FirstEnergy's analysis, the rates paid by Verizon "are, in aggregate, below the fully allocated cost-based rates."  *Id*. (citation omitted).

In addition, FirstEnergy argues that the PUC was required to initially determine whether Verizon demonstrated the existing rates it pays are unjust and unreasonable on a cost-of-service basis before awarding Verizon a new rate (*i.e.*, the New Telecom Rate).  However, this determination was never made, and Verizon did not present evidence upon which the PUC could have made such a determination.  FirstEnergy maintains that the PUC's and the Commonwealth Court's conclusion that the existing rates under the JUAs are unjust and unreasonable "is not based on any analysis or conclusion regarding the cost of service[.]"  FirstEnergy's Brief at 37.

FirstEnergy points out that this case proceeded from a complaint under Sections 701 and 1309 of the Public Utility Code. "[T]he fact that the New Telecom Rate may be **a** just and reasonable rate is irrelevant to the determination that the PUC was required by statute to make, *i.e.*, whether the existing rates contained in the [JUAs] are unjust and unreasonable." FirstEnergy's Brief at 39 (emphasis in original). FirstEnergy adds that "the question of whether the New Telecom Rate may be a just and reasonable rate only bears upon the second determination that the PUC was required by statute to make [–] establishing a just and reasonable rate." *Id*. However, "[t]he PUC could only make that determination if it **first** concluded existing rates to be unjust and unreasonable." *Id*. (emphasis added).

FirstEnergy contends that "the reasoning adopted by the PUC and the Commonwealth Court below ignores the well-established principle that there can be more than one just and reasonable rate." FirstEnergy's Brief at 40. FirstEnergy adds that a rate must only fall within a "broad zone of reasonableness" to be considered just and reasonable, *i.e.*, something other than confiscatory rates in violation of the Fifth and Fourteenth Amendments to the United States Constitution. *Id*. at 40-41 (citation omitted). FirstEnergy maintains that its existing pole attachment rates, which have been in effect for decades, fall within the zone of reasonableness. Thus, even if the New Telecom Rate is just and reasonable, the same can be said for the existing rates under the JUAs. *See id.* at 41.

## B. PUC

In response, the PUC argues that the Public Utility Code authorizes the PUC to supervise and regulate all public utilities doing business within the Commonwealth by issuing regulations as may be necessary or proper in the exercise of its powers or for the performance of its duties. *See* 66 Pa.C.S. § 501. In 2018, the PUC issued a Notice of

Proposed Rulemaking to begin the process of reverse preempting the FCC under 47 U.S.C. § 224(c) so that it could reassert its jurisdiction over pole attachment matters in the Commonwealth. *See* PUC's Brief at 26-27. The final rule was codified at Chapter 77 of Title 52 of the Pennsylvania Code in 2019. This rule reflected the PUC's determination "that it was best to adopt the well-established pole attachment rules of the FCC rather than attempt to create wholly separate Pennsylvania rates, terms, and conditions to govern pole attachment matters." *Id*. at 27. Thus, the PUC argues that its pole attachment regulations were established pursuant to its statutory authority, were properly promulgated after notice and comment, and are reasonable — per the *Tire Jockey* test.

The PUC explains that Section 1301 of the Public Utility Code requires that rates be not only just and reasonable "but also in conformity with regulations and orders of the [PUC]." PUC's Brief at 29. It asserts that 52 Pa. Code § 77.4 authorizes the PUC to utilize the FCC's rules when adjudicating a pole attachment matter. Consequently, the PUC's 2019 rulemaking 47 C.F.R. § 1.1413 is now Pennsylvania law, and pole attachment rates that satisfy 47 C.F.R. § 1.1413 are deemed just and reasonable and non-discriminatory, per Sections 1301 and 1304 of the Public Utility Code. *See* PUC's Brief at 29-30. Thus, the PUC argues that in applying the properly promulgated FCC rules to the present case, the PUC correctly held that Verizon was entitled to receive the New Telecom Rate — a rate less than the rate FirstEnergy was charging Verizon per the JUAs between them. *See* PUC's Brief at 30-31.

The PUC contends that because it determined FirstEnergy's pole attachment rates violated its regulations, it set just and reasonable rates to be observed, per Section 1309 of the Public Utility Code. The PUC asserts that it was empowered to vary or revise the rate in the JUAs upon a determination that the rate was unjust and unreasonable. *See* PUC's Brief at 31.

The PUC notes that the proponent of a rule or order has the burden of proof in a proceeding before the PUC and that it correctly placed that burden on Verizon to demonstrate that FirstEnergy's pole attachment rates violated the Public Utility Code, a PUC order or regulation, or a PUC-approved tariff of FirstEnergy. "Only when the ILEC attacher has satisfied this burden of proof will it obtain a rebuttable presumption that the rate it is being charged **may be** unjust and unreasonable." PUC's Brief at 35-36 (emphasis in original). The PUC contends that FirstEnergy had the opportunity to rebut the presumption that Verizon should receive the reduced New Telecom Rate but that it failed to do so.

Next, the PUC argues that FirstEnergy is incorrect in its assertion that existing rates, like those in the JUAs, are considered *per se* just and reasonable. Specifically, the PUC states the rates in the JUAs with Verizon were not approved by the PUC and therefore, as the PUC did not have jurisdiction or approve the JUAs (as amended by FirstEnergy and Verizon between 1999 and 2009), they should not be given the same deference as a PUC-approved rate. *See* PUC's Brief at 36-37. The PUC adds that it is its right, "[w]ithin the zone of reasonableness … to implement a methodology to derive the correct and just rate." *Id*. at 40.

Further, the PUC contends that its pole attachment rates do not require a complainant to demonstrate that the existing rates are unjust and unreasonable on a cost-of-service basis. *See* PUC's Brief at 40. The PUC cites *Lloyd* for the proposition that the Commonwealth Court has applied the incremental cost formula that the PUC set forth in its regulations. The PUC notes that, in *Lloyd*, the Commonwealth Court stated that "EDCs are only permitted to charge additional costs for pole attachment rates for use of excess space on the pole that the electric utility already uses." *Id*. at 41. The PUC maintains that it is authorized to set a cost-based rate applicable to pole attachers, even

if that rate is less than the fully allocated cost and merely reflects additional costs for use of excess space on a utility's pole. *See id.*

The PUC further argues that it duly considered the interests of FirstEnergy's customers when arriving at its decision. Initially, the PUC points out that Section 224 of the Communications Act, 47 U.S.C. § 224(c)(2)(B), does not suggest that the Commission alter rates to account for the interests of consumers when determining rates pursuant to the formulas and rules established by the FCC or a state commission. *See* PUC's Brief at 42. Regardless, the PUC contends that it **did**, in fact, consider the interests of FirstEnergy's customers in reaching its decision that FirstEnergy charged Verizon unjust and unreasonable rates. The PUC notes that the ALJ found that any loss of revenue FirstEnergy might experience from charging Verizon the New Telecom Rate must be recouped elsewhere and that such an issue could be addressed in FirstEnergy's next base rate proceeding. *See id.* at 42. In addition, the PUC notes that it found it was not clear from the record whether its decision would result in a base rate proceeding or a base rate increase. *See id.* at 43.

The PUC explains that under traditional ratemaking, utilities may not change rates outside of a base rate case, and there is no guarantee that FirstEnergy would be permitted to impose a rate increase — a matter that was unresolved in the PUC's decision here and one which can only be resolved in the context of a rate base proceeding. The PUC opines that pole attachment revenues are likely only a small proportion of FirstEnergy's revenues, such that even a sharp decline in pole attacher revenues "would not necessarily result in an overall increase in the rates FirstEnergy's customers pay for electric service, especially considering that numerous other factors will inform the [PUC's] determination of the actual rates in [a] rate base proceeding." PUC's Brief at 43. The PUC cautions that FirstEnergy "runs afoul of fundamental tenets of utility ratemaking," as

there is no **one way** of arriving at just and reasonable rates, and "the [PUC] has broad discretion in determining whether rates are reasonable and is vested with discretion to decide what factors it will consider in setting or evaluating a utility's rates." *Id*. at 43-44. The PUC adds that FirstEnergy's argument that its customers are being subjected to a secret rate increase is based on the faulty presumption that FirstEnergy will be permitted to impose a rate increase on its customers. *See id*. at 44. Further, the PUC states that while it expressed hope that providers who benefit from a pole attachment rate reduction would commit some portion of the savings to making broadband more available and affordable throughout the Commonwealth, it did not rely solely on this policy goal as the basis for its decision. *See id*. at 45-46.

## C. Verizon

Adding to the PUC's position, Intervenors/Appellees, Verizon Pennsylvania LLC and Verizon North LLC (collectively, Verizon), add that the PUC's pole attachment regulations are binding, as they meet all of the requirements of *Tire Jockey*, *i.e.*, they "fall squarely within the PUC's statutory authority," were issued following a procedurally proper rulemaking, and are reasonable. Verizon's Brief at 22-23. In addition, Verizon emphasizes that to be considered "just and reasonable," the pole attachment rates must be competitively neutral, which it states is "a synonym for non-discriminatory." *Id*. at 22. Verizon quotes the ALJ, noting that if a pole attachment rate is just and reasonable for purposes of the pole attachment regulations, "it also is, for example, the just and reasonable rate required by Section 1301 of the Public Utility Code." *Id*. at 23. Verizon contends that the pole attachment rates reflect the same "common-sense conclusion [] shared by the FCC" that the rate for all communications providers should be the same. *Id*. at 23-24. Verizon argues that the PUC did as it was required to do by applying its pole attachment regulations to resolve the present case.

In addition, Verizon asserts that FirstEnergy's arguments about different and inapplicable rate standards are irrelevant and incorrect and that the PUC was not required to apply a presumption of reasonableness to FirstEnergy's pole attachment rates, which, until this case, had never been reviewed or approved by the PUC as reasonable. Verizon maintains that assuming FirstEnergy's existing pole attachment rates are *per se* just and reasonable "would be inconsistent with history" and "would ignore the critical difference between tariffed rates that were approved by the PUC and pole attachment rates that were not." Verizon's Brief at 27.

Further, Verizon argues that it bore the burden of proof at all stages of the PUC's proceedings in this matter and successfully proved, by substantial evidence of record, that the pole attachment rates charged to it by FirstEnergy are unjust and unreasonable and, thus, violate the Public Utility Code and the PUC's orders and regulations.

Verizon adds that pole attachment rates are "fundamentally different from retail distribution and transmission rates, [in] which … 'cost of service' [has been described] as the 'polestar' of ratemaking." Verizon's Brief at 29 (*citing Lloyd*, 904 A.2d 1010). Verizon points out that electric utilities charge distribution and transmission rates to cover the costs of providing those services to retail electric customers, whereas pole attachment rates are charged for the use of excess space on electric utility poles. Thus, Verizon suggests, the PUC "was not required to subject pole attachment rates to the same rate-setting process that applies to retail distribution and transmission rates[.]" *Id*. at 30. Verizon characterizes FirstEnergy's complaint about the role of "cost of service" here as a policy disagreement with the PUC. *Id*. at 31. Verizon states that FirstEnergy's position is that the PUC should regulate pole attachment rates using a "fully allocated" cost methodology like the one that applies in the context of retail distribution and transmission rates, instead of the incremental cost methodology that the FCC has long applied and the

PUC has adopted. *Id*. Verizon argues that FirstEnergy could have advocated for the "fully allocated" methodology during the PUC's rulemaking, but it did not do so. *See id*. In this regard, Verizon contends that FirstEnergy should not be given "a second chance to argue for a different set of regulations." *Id*. Verizon further contends there is no statutory requirement that the PUC set pole attachment rates using a fully allocated cost methodology, and "it would have run afoul of its own regulations if it had." *Id*. at 32. Verizon maintains that the Commonwealth Court correctly rejected FirstEnergy's argument that the PUC was required to consider fully allocated costs.

Next, Verizon asserts "the PUC's pole attachment regulations set the [N]ew [T]elecom [R]ate as the just and reasonable rate for Verizon's use of excess space on FirstEnergy's poles[.]" Verizon's Brief at 33. Verizon adds that "once the PUC adopted the FCC's pole attachment regulations as its own, they became binding Pennsylvania law and continued to establish the sole just and reasonable rate FirstEnergy could lawfully charge." *Id*. at 34. Further, Verizon argues that it was entitled to have the rates charged by FirstEnergy to attach to its poles determined by the New Telecom Rate, and the PUC awarded such relief accordingly, "not because of 'hope' that relief will promote broadband opportunities for Pennsylvanians." *Id*. Verizon suggests that while the PUC may have had such a policy goal in mind when it adopted its pole attachment regulations, this goal did not serve as the basis for the PUC's decision in the present matter.

Verizon contends that the PUC's pole attachment regulations account for the interests of FirstEnergy's electric customers, and FirstEnergy's argument to the contrary has no support in the law or the record. Verizon states first that federal law only requires the PUC to make a specific certification to the FCC stating, *inter alia*, the State has the authority to, and does, consider the interests of the subscribers of services *via* the pole attachments, as well as the interests of the consumers of the utility's services. The PUC's

regulation satisfies the federal requirement by stating the PUC has the authority to consider the interests of the subscribers, as well as the interests of the utility's customers. Thus, Verizon contends the PUC complied with the plain terms of the federal law.

Second, the federal statute and PUC regulation state that the PUC must consider the interests of all relevant stakeholders, not just the interests of FirstEnergy's customers. "Under federal and Pennsylvania law, electric utilities **must** charge 'just and reasonable' pole attachment rates." Verizon's Brief at 36-37 (emphasis in original). As Verizon adds, "[t]his requirement must have meaning[,] even if electric rates might increase when the electricity utility complies with the law." *Id*. at 37. Verizon maintains that "[t]he PUC's consideration of the interests of FirstEnergy's customers cannot override FirstEnergy's legal obligation to charge just and reasonable pole attachment rates." *Id*.

Third, Verizon adds the PUC has, in fact, considered the interests of all relevant stakeholders, including electric customers, when regulating the pole attachment rates, as it considered input from four electric utilities and an electric association, in addition to input from communications attachers before deciding to provide a balanced approach to competing needs using the federal rules. *See* Verizon's Brief at 37-38. Further, Verizon points out the ALJ explained that Verizon had shown the PUC's new regulations would not trigger a base rate case for FirstEnergy because the amounts at issue averaged only about 0.23 percent of FirstEnergy's annual operating revenues. In addition, the PUC confirmed it would continue to consider the interests of FirstEnergy's customers if, and when, FirstEnergy should seek a rate increase in its next base rate proceedings. Thus, the PUC "has consistently kept [FirstEnergy's customers'] interests in mind." *Id*. at 39.

Fourth, Verizon suggests that the PUC did not subject FirstEnergy's customers to a "secret rate increase," as FirstEnergy argues. Verizon's Brief at 39. Specifically, Verizon points out that there has been no rate increase as a result of this case, and

"FirstEnergy recently agreed to refund $13.6 million (including interest) that it unlawfully collected from others without recovering the amounts through increased rates." *Id*. Verizon disputes FirstEnergy's contention that a rate increase is inevitable because it sought one in its base rate proceeding. However, Verizon argues that even if the PUC approved a rate increase for FirstEnergy sometime in the future as a result of this litigation, "it would only be because FirstEnergy and its customers have long benefited from 'money FirstEnergy was never entitled to receive in the first place.'" *Id*. at 41 (citation omitted).

As its fifth point, Verizon contends that FirstEnergy cannot evade the PUC's pole attachment regulations because there are other sources of broadband funding; "[t]he PUC's pole attachment regulations are binding, irrespective of the policy goals behind them or the possibility those goals could be furthered in different ways." Verizon's Brief at 42.

### D. FirstEnergy's Reply

In its Reply Brief, FirstEnergy counters that the determinations by the PUC here had nothing to do with cost of service — the bedrock of Pennsylvania utility law. Verizon was required to show, and the PUC was required to determine, that the existing pole attachment rates it was paying FirstEnergy under the JUAs was unjust and unreasonable. If Verizon was able to demonstrate same, it was then required to show what pole attachment rates **would be** just and reasonable and should be applied instead of the existing rates. FirstEnergy argues that, here, however, the PUC exceeded its authority, under Section 1312(a) of the Public Utility Law, by granting refunds to Verizon without

lawfully determining that the existing rates under the JUAs were unjust and unreasonable.[13]

## VII. DISCUSSION

At the outset, we point out that there was no requirement in law for the PUC to adopt the New Telecom Rate regulations in order to effectuate reverse preemption, and the PUC confirms this by noting in its reverse preemption order that it will not be bound by FCC precedent in applying the regulations. That said, the issue before us is whether the PUC had the authority to adopt these regulations.

First, the Public Utility Code provides that "the proponent of a rule or order has the burden of proof." 66 Pa.C.S. § 332(a). If there was any question whether this general provision applies to rate challenges, Section 315 provides the answer through omission: "In any … proceedings upon complaint involving any proposed increase in rates, the burden of proof to show that the rate involved is just and reasonable shall be upon the public utility." 66 Pa.C.S. § 315(a). Thus, only when the utility is proposing a rate increase does it bear the burden of establishing the proposed rate is just and reasonable. Where someone is challenging an existing rate, the default under Section 332 applies, and the **challenger** bears the burden of establishing the existing rate is unjust and unreasonable.

By contrast, 47 CFR § 1.1406 – the FCC regulation at issue – provides for a presumptive maximum attachment rate. *See* 47 CFR § 1.1406(b). Section 1.1406 is an

___

[13] We note that an amicus brief was filed by the Energy Association of Pennsylvania (Association) on behalf of the position put forth herein by FirstEnergy. The Association argues that the PUC failed to consider the requirements of its own enabling statute, inverted the burden of proof for complaints against existing rates, such as those in the JUAs, ignored adherence to cost-of-service principles and the Public Utility Code's rules for modifying contracts, and "beggar[ed] Pennsylvania's electric ratepayers," … while doing nothing to promote rural broadband." Association's Amicus Brief at 4.

application of statutory authority granted by 47 U.S.C. § 224(d), which states that a utility's pole attachment rate must not be "more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way." 47 U.S.C. § 224(d)(1).

The PUC has the authority to regulate rates charged by electricity distribution companies such as FirstEnergy. FirstEnergy makes no attempt to argue differently, nor does it directly challenge the PUC's authority to regulate its attachment rates in particular. Further, neither Verizon nor FirstEnergy assert that the PUC is without authority to regulate ILECs like Verizon.

The issue before this Court arises from the fact that Pennsylvania does not have a statute explicitly authorizing the regulation of **pole attachment rates**. Thus, the PUC must rely on its general authority to regulate the rates of public utilities as set forth in 66 Pa.C.S. § 1301(a). Notably, Section 1301(a) does not provide for presumptive maximum rates, instead it merely requires that any rate be "**just and reasonable**, and in conformity with regulations or orders of" the PUC. 66 Pa.C.S. § 1301(a) (emphasis added). Further, since the attachment rates at issue are existing rates, and not proposed rates, any challenger to the rate, such as Verizon here, bears the burden of establishing the rate is **unjust or unreasonable**. *See* 66 Pa.C.S. § 332(a).

The PUC and Verizon counter that the existing rates contained in the JUAs have not been approved by the PUC and therefore are not entitled to presumptive reasonableness. This argument is half-right. The existing rate set forth in the JUAs is distinct from normal rates that are approved by the PUC before they are imposed. This distinction has a legal effect that is relevant to some issues, but Section 332(a) places the

burden of proof on "the proponent of a rule or order[.]" 66 Pa.C.S. § 332(a). It does not explicitly refer to existing rates. As set forth above, Section 315(a) only changes the general rule when a public utility proposes **a rate increase**. *See* 66 Pa.C.S. § 315(a). Thus, Section 332(a)'s default burden of proof applies here because **FirstEnergy is not proposing a rate increase**.

Both Verizon and the PUC concede that Verizon bore the initial burden under Section 332(a) of the Public Utility Code. *See* PUC's Brief at 33; Verizon's Brief at 28. However, both contend that Verizon's burden under the PUC's regulations that reverse preempted the FCC is simply to show that the JUAs at issue were renewed after the effective date of 47 C.F.R. § 1.413(b), *i.e.*, March 11, 2019. *See* PUC's Brief at 34; Verizon's Brief at 28. To the extent the PUC's regulations may be valid, per *Tire Jockey*, they may be correct. However, **FirstEnergy challenges whether the regulations are, in fact, valid under *Tire Jockey*.** Under *Tire Jockey*, a regulation must be based on a grant of statutory authority. For the FCC, that authority for extending the New Telecom Rate to ILECs is, arguably, 47 U.S.C. § 224. There is no analog in Pennsylvania statutory law empowering the PUC to create a presumptive maximum cost. Indeed, there is no Pennsylvania statute explicitly empowering the PUC to regulate pole attachments at all. However, FirstEnergy is not making a broad-based attack on the PUC's authority to regulate pole attachments.

Section 1304 of the Public Utility Code also arguably undercuts the PUC's desire to adopt the FCC's New Telecom Rate regulations. Section 1304 directs that "[n]o public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person … or subject any person … to any unreasonable prejudice or disadvantage." 66 Pa.C.S. § 1304.

The FCC's New Telecom Rate is explicitly based on a federal policy, embodied in the PAA and TA96, to grant preferences to cable television providers and telecom providers over electrical utilities. Further, as this Court noted in *Dooner v. DiDonato*, 971 A.2d 1187 (Pa. 2006):

> In the absence of express preemptive language, Congress' intent to preempt all state law in a particular area may be inferred. This is the case where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation. That is to say, Congress intended federal law to occupy the entire legislative field (field preemption), blocking state efforts to regulate within that field. Finally, even where Congress has not completely displaced state regulation in a specific area, state law is nullified if there is a conflict between state and federal law (conflict preemption). …
>
> Additionally, concepts of federalism and state sovereignty make clear that in discerning whether Congress intended to preempt state law, there is a presumption *against* preemption.

*Id*. at 1193-1194 (emphasis in original) (internal citations omitted). Where there is no preemption, "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Gustafson v. Springfield, Inc.*, 333 A.3d 651, 678 (Pa. 2025) (citation omitted). Here, the United States Congress provided an explicit mechanism for states to escape any claim of field preemption or conflict preemption. Thus, it cannot be said that the PUC is required to apply federal law once it has chosen to reverse preempt regulation of pole attachments. And, as set forth above, the PUC agrees with this legal proposition, as it explicitly disclaimed it was bound by FCC precedent in regulating pole attachment rates.

With this in mind, the parties have pointed to no statute in Pennsylvania that authorizes the PUC to shift cost burdens from telecoms to electric utilities. In fact, in its 1987 decision *Re Pittsburgh TeleCommunications, Inc.*, *Re Pittsburgh*

*TeleCommunications, Inc.,* 64 Pa.P.U.C. 257 (1987), **the PUC specifically stated it did not have jurisdiction over pole attachments** because it had not adopted rules and regulations implementing such authority. However, it recognized its ability to do so in the future "to the extent permitted by then[-]effective law." *Id*. (emphasis added).

In an attempt to locate some statutory authority for creating a presumptive maximum just and reasonable rate, the ALJ, in his recommended decision, points to 66 Pa.C.S. § 3011.[14] Section 3011 is contained within Title 66, Chapter 30, which is entitled "Alternative Form of Regulation of Telecommunications Services." However, the portion of Section 3011 highlighted by the ALJ provides, at best, weak support for the New Telecom Rate regulations: "The General Assembly finds and declares that it is the policy of this Commonwealth to: … (6) Ensure the efficient delivery of technological advances and new services throughout this Commonwealth in order to improve the quality of life for all Commonwealth residents." 66 Pa.C.S. § 3011(6). This broad language does not reference attachment rates, or any other specific issue. Further, in context, none of the 13 goals listed in Section 3011 reference electric utilities. Instead, the clear focus is on prohibiting ILECs from acting in an anticompetitive manner.

**The inescapable conclusion is that the PUC has no statutory authority to enact a presumptive maximum just and reasonable pole attachment rate in favor of ILECS.** Because of this, 66 Pa.C.S. § 332(a)'s command that a complainant bears the burden of establishing an existing rate is unjust or unreasonable applies in attachment rate proceedings before the PUC. Thus, the PUC erred in concluding that Verizon met its burden when it merely proved that the JUAs were renewed after March 11, 2019. Under Section 332(a), Verizon bore the burden of establishing that FirstEnergy's rates

---

[14] Neither PUC nor Verizon refer to Section 3011 in their briefs to this Court.

were unjust or unreasonable. The FCC's presumptive maximum rate can be evidence of unreasonableness, but it cannot function as a presumption under Pennsylvania law.

As Commonwealth Court President Judge Cohn Jubelirer stated in her dissent, "[i]t is well settled that an agency's regulations cannot violate its enabling statute and that regulations that do so will 'fall by the wayside.'" *Verizon*, 303 A.3d at 246 (Cohn Jubelirer, P.J., dissenting) (citation omitted). Further, the Public Utility Code requires complainants to prove that existing rates are unjust and unreasonable by showing a change in facts and circumstances since the rates were originally fixed. However, here, President Judge Cohn Jubelirer correctly notes

> [t]he regulations adopted by the [PUC] for pole attachments effectively reverse who bears these heavy burdens. Instead of having to show that the negotiated, existing rate, that had to be just and reasonable or risk a complaint under Section 701 of the [Public Utility] Code, is now unjust and unreasonable or that there is rate discrimination, a complainant in a pole attachment case need only show that it entered into or renewed a [JUA] after March 11, 2019, the effective date of the FCC regulation[.]

*Id*. The Commonwealth Court dissent concluded that the PUC's decision reverses the burden set forth in the Public Utility Code by making the public utility show the existing rates are just and reasonable, and this is in conflict with the PUC's enabling statute.

The Commonwealth Court dissent was further troubled by what it saw as a lack of any real analysis by the PUC as to the effects on FirstEnergy's customers and whether any cost savings for Verizon would be passed along to its customers or merely enrich Verizon's shareholders. We agree with these concerns and with the dissent's conclusion that the PUC's decision is contrary to the Public Utility Code and Pennsylvania precedent, and thus, must "fall by the wayside." *Verizon*, 303 A.3d at 246 (Cohn Jubelirer, P.J., dissenting) (citation omitted).

Because we conclude that the PUC erred by improperly placing the burden of proof on FirstEnergy to establish that its rates were just and reasonable, we vacate the

Commonwealth Court's order affirming the PUC and remand to the Court to remand to the PUC for further proceedings consistent with our Opinion. Accordingly, we need not reach the remaining issues we accepted for review.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Mundy and Brobson join the opinion.